*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 26, 2021

Plaintiff-Appellee,

v

No. 350555
Crawford Circuit Court
LC No. 18-004302-FC

JOHN ROBERT O'CONNOR,

Defendant-Appellant.

Before: RONAYNE KRAUSE, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

Defendant, John Robert O'Connor, appeals by right his jury-trial conviction of second-degree murder, MCL 750.317. Defendant also entered a plea of guilty to disinterment or mutilation of a dead body, MCL 750.160. The trial court sentenced defendant to serve 375 to 600 months (31 years and 3 months to 50 years) in prison for second-degree murder, and it sentenced defendant to 57 to 120 months (4 years and 9 months to 10 years) for disinterment or mutilation of a dead body. We affirm.

## I. FACTUAL BACKGROUND

Defendant killed the victim, his former partner Michelle Kukulski, by repeatedly striking her over the head with a can of yams. At trial, defendant did not deny that he killed Kukulski. Rather, defendant's theory of the case was that he committed voluntary manslaughter rather than murder, and he was provoked by Kukulski's insistence that she would allow their 10-year-old daughter to be around Kukulski's boyfriend, Larry Farley, who had been recently released from prison for a heinous kidnapping conviction involving a young woman.[1] Multiple witnesses testified that defendant had expressed for months that he was concerned about Farley's conviction. Defendant testified that he had worked out an agreement with Kukulski that she would not expose the daughter to Farley, but that Kukulski regarded the agreement as a joke. According to

---

[1] Farley died during the pendency of the proceedings.

defendant, he "snapped" when, as Kukulski was leaving his house after helping clean the daughter's room and collect some items from his garage, Kukulski

> stuck her finger in my face and said I don't care what anybody says Larry Farley's gonna be a part of [the daughter's] life because he's part of my life. So whatever agreement we made it's off.

After defendant struck Kukulski several times, he put her into her van. Defendant testified that he "maybe could have called 911" but was afraid of what would happen to his daughter. The next morning, he "went out to see if [Kukulski] was still there, and I pretty much she had expired [sic] because she had urinated herself." Defendant then took Kukulski's clothes off, wrapped her body in a comforter, and concealed her body in the woods. He then moved Kukulski's van, disposed of her cellphone, and burned the can with which he struck her.

The prosecution argued that defendant committed first- or second-degree murder because he knew for months that Kukulski was dating Farley. Defendant argued that he committed voluntary manslaughter because he killed Kukulski in the heat of passion. The jury found defendant guilty of second-degree murder.

## II. PROSECUTORIAL ERROR

Defendant argues that the prosecution's use of the word "murder" during his trial when referring to Kukulski's death violated his due-process rights by impermissibly shifting the burden of proof. We disagree.

### A. STANDARDS OF REVIEW AND PRINCIPLES OF LAW

A prosecutor can deny a defendant's right to a fair trial by making improper remarks that infringe on a defendant's constitutional rights or by making remarks that "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v DeChristoforo*, 416 US 637, 643; 94 S Ct 1868; 40 L Ed 2d 431 (1974). Prosecutorial remarks must be considered in context and in light of the totality of the evidence. *People v Bahoda*, 448 Mich 261, 267 n 7; 531 NW2d 659 (1995). A prosecutor may not undermine the defendant's presumption of innocence. *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008). However, prosecutors have "great latitude" and may "argue the evidence and all reasonable inferences from the evidence" in support of their theory of the case. *Bahoda*, 448 Mich at 282. "[I]n order for prosecutorial misconduct[2] to be constitutional error, the misconduct must have *so infected the trial with unfairness as to make the conviction a deprivation of liberty without due process of law*." *People v Blackmon*, 280 Mich App 253, 269; 761 NW2d 172 (2008) (emphasis in original). "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate

---

[2] Although prosecutorial misconduct is a term of art used to refer to a wide variety of conduct, this Court may use the term prosecutorial error to describe conduct that is not extreme or illegal. *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015).

prosecutorial statements, and jurors are presumed to follow their instructions." *Unger*, 278 Mich App at 235 (citation omitted).

## B. ANALYSIS

It was not disputed that defendant killed Kukulski and that the killing constituted a homicide. Rather, the issue was the degree of homicide. During opening statements, the prosecutor told the jury, "[w]e believe that the evidence will show that [defendant] murdered [Kukulski]," and then explained the nature of an open murder charge to the jury. During closing argument, the prosecutor referred to defendant having murdered Kukulski, and at the end of rebuttal closing argument asked the jury, "[p]lease find him guilty of, of premeditated murder." These references to murder were proper statements of the prosecutor's theory of the case or reasonable inferences from the evidence. *Bahoda*, 448 Mich at 282. Furthermore, the trial court repeatedly instructed the jury that the attorneys' arguments were not evidence, on one occasion even interrupting the prosecutor's rebuttal closing argument to do so.[3] *Unger*, 278 Mich App at 235. Therefore, these references were neither improper nor unfair.

Defendant has identified a total of four other instances, over a course of two full days of substantive testimony, where the prosecutor referred to Kukulski's death as "murder" or to defendant as having "murdered" Kukulski. Three of those instances occurred in close temporal proximity with a single witness. After the first instance, defense counsel objected, pointed out that "murder" was a legal term, and stated that "death" or "killing" would be more appropriate terminology. The trial court overruled defendant's objection, stating it had "already determined that it's fair for it to be described as whatever, and both of you can refer to it as whatever you think is appropriate." The fourth instance was a single reference in the context of the prosecutor asking defendant's neighbor what defendant had been doing "[f]or the couple of weeks leading up to [Kukulski] going missing and ultimately a discovery that [defendant] had murdered her." Later, while questioning the same witness, the prosecutor referred to defendant having "killed" Kukulski.

The trial court's explanation of its ruling, in conjunction with its instructions to the jury, would have made the jury aware that "murder" was just the prosecutor's opinion at that point. In any event, these few remarks were too brief and isolated, especially considering the lengthy trial and the various ways in which the killing was referenced, to have been particularly prejudicial. See *Unger*, 278 Mich App at 239. Considering the totality of the circumstances, we conclude that the prosecution's use of the word "murder" did not infect defendant's trial with unfairness.

## III. DEFENDANT'S PRIOR CONSISTENT STATEMENTS

Defendant argues that the trial court erred by excluding evidence of statements he made during a police interview, or, in the alternative, that his trial counsel rendered ineffective assistance

---

[3] During rebuttal closing argument, defense counsel objected that the prosecutor misrepresented some of the evidence regarding when defendant had written a statement. In response, the trial court reminded the jury that the jurors should rely on their memories and common sense if they thought the evidence differed from what a lawyer said, and it also "remind[ed] you again that the lawyer's statements are not evidence."

by failing to cite an appropriate rule of evidence under which those statements should be admitted. We disagree with both arguments.

## A. BACKGROUND

It is necessary to provide additional background to comprehend these arguments. Crawford County Sheriff's Deputy John Klepadlo was one of several officers involved in the investigation into Kukulski's disappearance and death. On direct examination, Klepadlo testified regarding his involvement in the discovery of the last known location of Kukulski's cellphone, the discovery of her van, and the execution of a search warrant at defendant's house. On cross-examination, defense counsel established that Klepadlo was not originally the officer in charge of the case, but that Klepadlo inherited the case when the original officer in charge retired. Defense counsel then asked Klepadlo, "now [defendant] didn't tell you the truth several times about what happened right?" The prosecution objected that the question sought to admit defendant's own statements, which was a violation of the hearsay evidence rule.

The trial court permitted defense counsel to research and argue the matter before ultimately sustaining the prosecution's objection. The trial court explained that defendant could seek to admit what he told Klepadlo as a prior statement of a witness to rebut an expressed or implied charge of recent fabrication, which would not be hearsay pursuant to MRE 801(d)(1)(C). However, he could not do so until—or if—defendant testified. The trial court recognized that the procedure of recalling Klepadlo to the stand might be time-consuming, but "a waste of time" was not a legally valid rebuttal to the prosecutor's objection. Defense counsel then stated his intent to recall Klepadlo after defendant testified, and the prosecutor explicitly stated that she had no objection to defense counsel doing so.

Defendant did ultimately elect to testify. Before defendant took the stand, the trial court reminded defense counsel that he had the option of recalling Klepadlo. Defendant provided extensive testimony regarding the history of his relationship with Kukulski and his daughter, his concerns about both, and many of the circumstances leading up to his killing of Kukulski.[4] As noted, defendant testified that he had a "personal agreement" with Kukulski not to allow the daughter around Farley, but because they had no formal custody order, neither of them could

---

[4] Although not directly relevant to this appeal, defendant explained that after he and Kukulski moved in together, their relationship changed: Kukulski became unreliable and apparently stole money from him, and he discovered that Kukulski had a problem with drugs and alcohol. Defendant also explained that further back in time, his ex-wife (i.e., not Kukulski, who he never married) had left him (with the children he and his ex-wife had together) for another person who turned out to be abusive, and his ex-wife was eventually convicted of child abuse. He described his own relationship with his and Kukulski's daughter as good, but that Kukulski and the daughter did not get along. Nevertheless, after he and Kukulski broke up, Kukulski began taking the daughter and associating with people who plied the daughter with expensive gifts and possibly acted inappropriately with the daughter. Defendant became especially concerned when he discovered messages from Kukulski to the effect that she believed defendant could not handle the daughter, and that was why she intended to have Farley handle the daughter. Defendant was also concerned that Kukulski had referred to the daughter as a "devil child."

enforce any agreement against the other. Defendant testified that he was interviewed by the police numerous times, and on one occasion, Klepadlo told him that Kukulski "had filed for full custody Wednesday before the incident occurred," which defendant later found out was untrue. Defendant testified that he had repeatedly told officers that "what happened was not because of custody," and that what he wanted was for his daughter not to be around Farley. Defendant nevertheless admitted that he initially lied to the police and numerous other individuals about what had happened. When defense counsel asked defendant why he did not tell people what Kukulski had said about permitting the daughter to be around Farley, the prosecutor objected, again asserting that any response by defendant would be inadmissible hearsay.

The trial court permitted defense counsel to make a record. Defense counsel argued that the prosecutor had opened the door by arguing that defendant had not told the police what Kukulski said to him, that defendant's response would be probative of his state of mind, and that it would undermine Klepadlo's credibility because Klepadlo had allegedly lied at the preliminary examination. The trial court sustained the objection. Thereafter, defendant resumed his testimony and reiterated that he had consistently maintained that he did not want his daughter around Farley, following which he described the circumstances of the killing itself.

At the conclusion of defendant's testimony, defense counsel stated that he would not recall Klepadlo because he would be unable to conduct an examination given the court's rulings. The trial court expressed concern that defense counsel had perhaps misunderstood its rulings. The trial court explained that it understood defense counsel to have sought admission of defendant's statements under the "party opponent exception" to hearsay.[5] Defense counsel explained that his position was that "Klepadlo made two statements under oath about what [defendant] said to him," and that those statements by Klepadlo were untrue and "make it look like [defendant] is guilty of a higher charge." The trial court then made the following ruling:

> [H]ad you explained it to me as clearly as I think you did just now I don't think I would have considered the same result. Because there's differences between an exception and an inclusion to hearsay. And so I'll allow you to ask Deputy Klepadlo what the defendant said. That's not offered for the truth of the matter. It's to find out whether he accurately reported it based upon the offer of proof.
>
> * * *
>
> It's coming in because it's non-hearsay to begin with. It's not asking – it's not bringing in a statement out of court in order to prove the truth of the matter asserted. The only prohibition on hearsay is exactly that. It's when a statement is offered for the truth of the matter. It's offered for a completely different purpose. It's offered to show that it was said to this Deputy. And then whether or not the Deputy reported it consistently later, or didn't. It's not being offered to prove that whatever [defendant] said was true.

---

[5] The trial court cited MRE 801(D)(1), which was likely inadvertent; the party opponent exception is under MRE 801(D)(2).

In fact I think the opposite has already been made clear to the record we've created. [Defendant]'s already acknowledged to [the prosecutor's questions] that he's lied about nearly everything that he said in his initial interviews to the police. And then later came to, came to start telling the truth. So I don't think it can possibly be argued that it's been offered initially to prove the truth of the matter asserted. [Defendant] admitted he lied about it. So that's my clarification. It's just not hearsay because of the reason it's being offered.

Defense counsel then acknowledged that he understood he could recall Klepadlo after all. Nevertheless, defense counsel ultimately did not call Klepadlo or any other further witnesses.

## B. STANDARDS OF REVIEW AND PRINCIPLES OF LAW

The trial court's decision whether to admit evidence is reviewed for an abuse of discretion, but preliminary legal determinations of admissibility are reviewed de novo. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Duncan*, 494 Mich 713, 722-723; 835 NW2d 399 (2013). "A trial court necessarily abuses its discretion when it makes an error of law." *Id*. at 723. However, even if a trial court errs in the admission or exclusion of evidence, reversal of a preserved, nonconstitutional error is generally not warranted if the error is harmless. *People v Williams*, 483 Mich 226, 231-232; 769 NW2d 605 (2009). "Merely framing an issue as constitutional does not make it so." *Blackmon*, 280 Mich App at 261. A due-process violation occurs when, considering the totality of the circumstances, the unfairness fatally infected the judicial process. *People v Joly*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 354379); slip op at 5.

Defendant did not preserve his claim of ineffective assistance of trial by seeking a new trial or an evidentiary hearing. See *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973). Generally, a defendant's ineffective assistance of counsel claim is a mixed question of fact and law. *People v Riley*, 468 Mich 135, 139; 659 NW2d 611 (2003). However, when no hearing was held, this Court's review is limited to mistakes apparent from the record. *Id*. A defendant asserting ineffective assistance of counsel must show both that counsel's performance was objectively deficient and a reasonable probability that counsel's errors affected the outcome of the proceeding. *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018).

## C. ANALYSIS

Defendant argues that the reason he wanted to admit evidence of his statements to Klepadlo

was to rebut the prosecution's allegations that [defendant] didn't say a specific statement that [defendant] said to [Kukulski] before the incident happened. In other words, there was an express or implied charge of a recent fabrication or the prior statements made prior to the time any supposed motive to falsify had arisen by the prosecutor.

However, defendant does not identify any such assertion by the prosecutor during her opening statement, nor is any such assertion obvious from our review of the transcript. Furthermore, this argument conflicts with defense counsel's explanation to the trial court, which was that Klepadlo

-6-

had lied about what defendant said during an interview. Our review of Klepadlo's trial testimony likewise does not reveal any obvious statement about anything defendant did or did not say to Klepadlo. From our review of defendant's brief and of the record, we are unable to conclude that the exclusion of defendant's prior statements—irrespective of whether that exclusion was erroneous—had any effect on the outcome of the trial.

During closing argument, the prosecutor mostly argued that the jury should find defendant guilty of first-degree premeditated murder, citing evidence that defendant had taken his breakup with Kukulski badly, he placed a GPS tracking device on Kukulski's van, he acquired her private social media and text messages, and shared a transcript from Farley's trial with his friends and family. The prosecutor also cited defendant's efforts to conceal what happened to Kukulski after he killed her, including his extensive lies. The prosecutor also discussed the possibility of voluntary manslaughter, under which the jury would need to find that defendant killed Kukulski in the heat of passion. The prosecutor pointed out that it would "have to believe that [Kukulski] actually said to him, hey Larry Farley is going to be in, in her life and that's sent [sic] him completely over the edge." The prosecutor did not argue that defendant lied about what Kukulski said, but rather that his reaction was unreasonable for two reasons. First, because defendant knew for months that Kukulski had been dating Farley, and the disagreement was not a surprise. Secondly, because although Farley had indeed committed a heinous crime in 1988, defendant had never met Farley and had no idea what Farley was like thirty years later. Thus, the gravamen of the prosecutor's argument was that defendant's supposed provocation was insufficient, even if true. The prosecution never asserted that defendant had made inconsistent statements beyond the lies to which he openly admitted on the stand, nor did the prosecution seemingly rely on anything Klepadlo said.

In summary, we cannot find any reason why the exclusion of defendant's prior statements had any effect on the proceedings. Therefore, even if the exclusion of those statements was erroneous or defense counsel was ineffective for failing to make a proper argument for the admission of those statements, reversal would not be warranted. *Williams*, 483 Mich at 231-232; *Randolph*, 502 Mich at 9.

## IV. SENTENCING GUIDELINES

Defendant raises two challenges to his sentencing guidelines scores. However, at oral argument, defendant conceded that his sentencing guidelines argument is precluded by law of the case doctrine. See *People v O'Connor*, unpublished order of the Court of Appeals denying leave to appeal "for lack of merit in the grounds presented" (Docket No. 352246), entered February 20, 2020. We note that, in any event, the trial court is only required to correctly score a defendant's highest-classified crime, *People v Lopez*, 305 Mich App 686, 689-692; 854 NW2d 205 (2014), and as the trial court noted, defendant's sentence for disinterment or mutilation of a dead body is completely subsumed by his sentence for second-degree murder. Therefore, any error in scoring OV 10 for defendant's sentence for disinterment or mutilation of a dead body would be harmless.

-7-

Finally, even if we were to address defendant's argument regarding OV 19, we would not be persuaded that the trial court erred.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Jane M. Beckering
/s/ Mark T. Boonstra