*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WILLIE CHARLES WOODS,

        Defendant-Appellant.

UNPUBLISHED
October 07, 2024
2:39 PM

No. 365996
Ingham Circuit Court
LC No. 21-000265-FC

Before: BORRELLO, P.J., and MURRAY and LETICA, JJ.

PER CURIAM.

Defendant appeals by right his convictions of first-degree premeditated murder, MCL 750.316, and armed robbery, MCL 750.529, for which the trial court sentenced defendant to serve concurrent prison terms of life without the possibility of parole for the murder conviction, and 30 to 75 years for the armed-robbery conviction. We affirm.

## I. STANDARDS OF REVIEW

Unpreserved claims are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Reversal is warranted only if the plain error resulted in the conviction of an innocent person, or seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence. *Id*.

This Court reviews a trial court's decision to grant or deny a new trial for an abuse of discretion. *People v Muniz*, 343 Mich App 437, 441; 997 NW2d 325 (2022). A court abuses its discretion when it chooses an outcome that is not within the range of principled outcomes. *People v Orlewicz*, 293 Mich App 96, 100; 809 NW2d 194 (2011), remanded on other grounds by 493 Mich 916 (2012).

The constitutional question whether an attorney provided ineffective assistance, depriving a defendant of the right to counsel, is reviewed de novo. *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008).

## II. JURY SELECTION

Defendant argues that the trial court improperly empaneled an "anonymous jury," with the potential jurors identified by number, not name, without providing an instruction that using such a procedure was a matter of logistics rather than a reflection on defendant's perceived guilt or dangerousness.

"An 'anonymous jury' is one in which certain information is withheld from the parties, presumably for the safety of the jurors or to prevent harassment by the public." *People v Williams*, 241 Mich App 519, 522; 616 NW2d 710 (2000). An " 'anonymous jury' is an extreme measure, in which 'certain biographical information about potential jurors' is withheld, even from the parties," in contrast to when jurors are "merely referred to at trial by number rather than by name." *Id*. at 523, quoting *United States v Branch*, 91 F 3d 699, 723 (CA 5, 1996). The jury was not a pure anonymous jury. Before jury selection, the trial court stated that "we will use numbers, not names," but only the names of the prospective jurors were withheld, and defendant does not argue that general biographical information was in fact withheld. This procedure was similar to what this Court approved of in *Williams*, in which there was "nothing in the record to support the conclusion that any information was actually withheld from the parties," because, "[a]t most, the names of the jurors were replaced by numbers." *Williams*, 241 Mich App at 523. This Court concluded that the "defendant's due process rights were not violated by using juror numbers instead of names at trial." *Id*. at 525.

The dangers of empaneling an "anonymous jury" are that a defendant could be denied "a meaningful examination of the jury," or that the presumption of innocence could be compromised. *Id*. at 522-523. To show that a defendant's rights were violated, the record must demonstrate such compromise, or that "the parties have had information withheld from them, thus preventing meaningful voir dire." *Id*. at 523. Here, during voir dire the trial court questioned the potential jurors, as did defendant and the prosecution. The prosecution's questioning explored any possible bias of potential jurors by asking about issues such as media exposure to the case, employment background, education and experience, including current employer and occupation, and perceptions about the burden of proof and punishment. Defendant probed various potential jurors about employment issues as it related to their attitudes and feelings about premeditation, the burden of proof, media exposure, and making decisions within a group. On appeal, defendant does not identify any areas that the defense was not allowed to explore with potential jurors, and conceded at the hearing on his motion for a new trial: "I don't mean to suggest that the counsel did not have sufficient information to conduct meaningful Voir Dire. Of course they did. They conducted lengthy Voir Dire." As in *Williams*, the voir dire covered a number of personal topics, and there is no indication that the parties did not have access to the juror questionnaires. In fact, the record provides no indication that any information about the jurors, other than their names, was kept secret. Defendant has not shown how his ability to examine the potential jurors was compromised in any way.

We also reject defendant's argument that the trial court did not instruct the jurors that the use of numbers to identify them was a matter of logistics, rather than a reflection of defendant's perceived guilt or dangerousness. This Court held in *Williams* that "[t]here is no suggestion that jurors understood the use of numbers rather than names to be anything out of the ordinary," and therefore that "there was no suggestion that defendant's trial was being handled in a special way,

with the resulting implication that he was generally dangerous or guilty as charged." *Id*. at 524. Likewise, there is no indication in this record that the jury was given any basis for looking upon defendant as presenting any special danger because the jurors were referred to by number. There was no discussion about why numbers were being used, and therefore no basis upon which the jury might presume that this approach was other than standard procedure. Defendant has not shown that identifying jurors by numbers, rather than names, interfered with his presumption of innocence. Indeed, the trial court thrice instructed the jury, including twice during jury selection, that defendant was presumed innocent. "[J]urors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Under these circumstances there was no plain error. *People v Hanks*, 276 Mich App 91, 93-95; 740 NW2d 530 (2007).

## III. PROSECUTORIAL ERROR

Defendant argues that the prosecutor's cross-examination of defendant constituted "persistent misconduct" because it was used "to drive [defendant] to a state of agitation."

The prosecutor has a duty to ensure that a defendant receives a fair trial. *People v Farrar*, 36 Mich App 294, 299; 193 NW2d 363 (1971). The responsibility of a prosecutor is "to seek justice and not merely convict." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "[T]he test of prosecutorial misconduct[1] is whether a defendant was denied a fair and impartial trial." *Id*. A fair trial "can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence." *Id*. at 63-64.

" 'Witnesses are entitled to respectful consideration, and it is the duty of courts to see that they are protected from the insinuations and attacks of counsel . . . .' " *People v Whalen*, 390 Mich 672, 684; 213 NW2d 116 (1973), quoting *People v Cahoon*, 88 Mich 456, 461; 50 NW 384 (1891). A prosecutor must refrain from denigrating a defendant with intemperate and prejudicial remarks. *People v Bahoda*, 448 Mich 261, 282-283; 531 NW2d 659 (1995).

Here, defendant asserts that the prosecuting attorney was aware that defendant had questionable mental health, and attempted to inflame defendant with his questioning. Defendant points out that he had informed the trial court that he had not been prescribed psychotropic medications while incarcerated, which he had taken in the past. Further, defendant attended trial with a "stun cuff" attached to his lower leg under his pants, which could be used to administer an electric pulse to immobilize defendant, because he had engaged in violent behavior while incarcerated.

Absent in defendant's argument for this issue, however, is any specification of allegedly inappropriate questions, or any objectionable line of questioning. Defendant mentions only that certain questioning angered him to where he requested a break. The questioning that preceded

---

[1] The phrase "prosecutorial misconduct" is a term of art used to describe any error committed by the prosecution, even though claims of inadvertent error by the prosecution are "better and more fairly presented as claims of 'prosecutorial error,' with only the most extreme cases rising to the level of 'prosecutorial misconduct.' " *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015).

defendant's request for a break because "I'm about to go crazy in here" consisted of the prosecuting attorney asking defendant whether he used his relationship with Erwin Bell to enter Bell's apartment to ask for money, which defendant denied by stating that he did not involve his aunt, who was an acquaintance of Bell's, in the matter. The prosecuting attorney then attempted to elicit from defendant confirmation that he entered the apartment, that he had a BB gun in his backpack, that Bell made a comment about sexuality that angered defendant, and that Bell approached defendant with a knife, when defendant responded that the prosecuting attorney was "leaving things out," and interrupted the next question to interject that he told Bell he was going to leave before Bell approached with a knife.

The prosecuting attorney continued to suggest that defendant had stated that Bell swung the knife at him and that he struck Bell with the BB gun, and asked, "One of the things you forgot is when did you get the BB gun out of the backpack?" The prosecuting attorney continued, after stating that Bell was much older and smaller than defendant, to recount defendant's testimony that he struck Bell with the BB gun, causing him to drop the knife, and suggested to defendant that he decided to kill Bell when Bell angered him with a sexual comment. Defendant responded that he did not intend to kill Bell, but rather intended to protect himself, explained that he had witnessed older inmates in prison stab younger ones, asked the prosecuting attorney if he had been to prison, and commented about his own difficulties understanding other persons.

Questioning then moved on to confirming that defendant had inflicted the cutting wounds on Bell, who was attempting to evade the attack, and suggesting twice to defendant that he decided to stab Bell, eliciting defendant's response that he did not formulate a plan, but was "[p]rotecting myself, man. I don't know what you talking about." The prosecuting attorney then suggested to defendant that he observed that Bell was dying, but did not attempt to get help, and defendant responded that there was no point, upon which the prosecuting attorney commented that he could have helped Bell, and defendant stated: "I could have just stabbed him all up and slit his throat, chopped him up in his heart. If I really wanted to get the job done, why would I stop?"

The prosecuting attorney questioned defendant as to whether he became "tired" that Bell was not yet dead when he was lying on the floor, such that defendant "stabbed him right through the heart and killed him; right, sir?" Defendant interjected, "That's your assumption," adding "I seen the whole thing. I was there. Was you there?" Defendant then explained that he was not aware that he had stabbed Bell's chest because Bell was wearing a sweatshirt, then said, "You racist, man, racist."

Defendant was asked to watch a portion of his interview with the police, after which he confirmed that he gathered some money from Bell's apartment after the killing. The prosecuting attorney then moved on to discuss defendant's conduct of rolling the body in a blanket and hiding it in a closet, which defendant confirmed, before, apparently exasperated, requesting a break.

Defendant argues that this questioning was analogous to what the United States Supreme Court disapproved of in *Berger v United States*, 295 US 78, 84; 55 S Ct 629; 79 L Ed 1314 (1935):

> That the United States prosecuting attorney overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense is clearly shown by the record. He was guilty

-4-

of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner.

However, the questions here concerned matters regarding which defendant had testified, and reasonable attendant inferences. The prosecuting attorney was direct in his questioning, and insistent on obtaining answers regarding intent, even if detecting that defendant was responding in an increasingly adversarial manner. The prosecution's probing questions based on defendant's testimony were not rendered improper by defendant's increasingly unresponsive and aggressive responses. The prosecutor did not misstate facts, but probed possible inferences from the evidence, and did not engage in the "bullying and arguing" at issue in *Berger*. Accordingly, the record does not support defendant's claim of prosecutorial error in relation to this questioning.

Because defendant has not identified any basis for a successful objection to the any of the prosecutor's questions, he has failed to establish that his counsel was ineffective for not raising any objection. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Affirmed.

/s/ Stephen L. Borrello
/s/ Christopher M. Murray
/s/ Anica Letica

-5-