# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

           Plaintiff-Appellee,

v

JAMES GRAHAM COOPER, JR.,

           Defendant-Appellant.

FOR PUBLICATION
January 22, 2015
9:05 a.m.

No. 318159
Lenawee Circuit Court
LC No. 13-016293-FC

Before: MURRAY, P.J., and SAAD and K. F. KELLY, JJ.

MURRAY, P.J.

Defendant appeals as of right his jury trial convictions of first-degree home invasion, MCL 750.110a(2), assault with intent to commit murder, MCL 750.83, and torture, MCL 750.85. Defendant was sentenced to 320 to 640 months' imprisonment for first-degree home invasion, life in prison for assault with intent to commit murder, and 900 to 1,800 months' imprisonment for torture. Defendant was sentenced as a *12th* habitual offender, MCL 769.12. We affirm.

## I. INTRODUCTION

We review thousands of criminal cases each year. Unfortunately, far too many involve murder or other severe criminal depravity. This case is amongst the worst. The facts presented to the jury were established in large part by the victim who unequivocally identified defendant as the main attacker. Also testifying against defendant were two of his former associates, both of whom provided the background leading to this truly horrific attack. We conclude that none of defendant's arguments has any merit. Consequently, we affirm all the challenged rulings of the trial court.

## II. FACTS

Typical of many of the violent crimes committed in this state, the events leading to this case started off with the use of illegal narcotics, and quickly led to an escalation of criminal activity. In December 2012 the victim, Henry Merritt, allowed his adult daughter, Jessica Tabernero, and her daughter to live in his home with him. Jessica had a bad drug addiction. After her work ended at a local bar in the early morning hours of December 30, 2012, Jessica went to defendant's brother-in-law, Eric Williams's, home (where defendant also lived) and began using crack cocaine. Also present were defendant and his wife Leah, Williams, and Jessica Miller. All were, and had been, ingesting significant amounts of crack cocaine. Soon

-1-

after her arrival, defendant asked Jessica to have sex with Leah as a birthday present to her; she agreed, and after doing so she exited the room and began showing signs of overdosing. While in that condition she stated that her father had raped her. Hearing this, defendant asked for her father's name and address, left the house and picked up Leondre McCarver, defendant's drug supplier, and proceeded to Merritt's home.

Thus, in the early morning of December 30, 2012, Merritt heard a loud noise that sounded like a loud boom coming from his kitchen. Merritt went to his kitchen and saw two men, a black man and a white man whom Merritt identified as defendant, though he had never seen either man before.[1] Merritt asked the two men why they were in his home, to which they responded: "We're here to do a job." After this interaction, Merritt was "subdued by both of them and beat mercifully [sic] around [his] face area." The men then took Merritt to his bedroom, where defendant accused Merritt of having sex with Tabernero. Merritt told them that he did not have sex with his daughter,[2] but that his ex-wife's husband had done so.

Undeterred by Merritt's statement, both men continued to beat and choke Merritt while also continuing to accuse him of having sex with Tabernero. Defendant told Merritt that if he had anything "relating to sex" in his home, defendant was going to kill him. After this, Merritt was in and out of consciousness. Eventually, the two men dragged Merritt to the bathroom, "[f]orcibly," with a belt around his neck. Defendant and McCarver continued to beat Merritt in the bathroom.

Defendant then put Merritt in the bathtub, continued punching Merritt, and told McCarver to get a gas can that was just outside Merritt's house. Defendant then doused Merritt with gasoline and said, "You're going to feel it, you're going to feel the wrath of me, you're going to feel the pain." Defendant then lit Merritt on fire. Merritt's neck was the only part of his body that caught on fire.

Merritt prayed "the whole time out loud and to [himself] asking God to help [him]." The pain from the fire was indescribably hot, and Merritt endured the heat until the gasoline burned itself out. To help with the pain, Merritt turned on the shower. Defendant reacted violently after Merritt turned on the water, punching him repeatedly. After that defendant repeatedly hit Merritt's head with a hammer. Merritt was lit on fire again, burning his neck and upper back. Eventually, defendant and McCarver left the bathroom, and Merritt moved a dresser to block the bathroom door. However, both men obtained reentry after they broke the door down.

Eventually, defendant and McCarver left. The damage to Merritt's body was horrific. His middle finger was sliced off and he was stabbed in the arm either with a knife or the claw of a hammer. Merritt's arm was broken, his neck and top part of his shoulders were burnt, and his face was bloody and swollen. Before getting help for his injuries, Merritt went downstairs in his

---

[1] Merritt was shown a photo array before trial and selected defendant without hesitation.

[2] Jessica subsequently indicated that this was true. Merritt had not raped her.

home to smoke a cigarette. After he finally[3] lit the cigarette, Merritt went outside and called for help: Merritt's neighbors, Laurie Damon and Tori Helsel, came to his rescue. Both testified that his injuries were so horrific that they were surprised that he could talk. Merritt was evacuated by helicopter to a hospital.

Based on these facts defendant was convicted of the aforementioned crimes by a jury of his peers. After his appeal was filed, we granted defendant's motion to remand for a *Ginther*[4] hearing to develop his argument that he was denied the effective assistance of counsel. *People v Cooper*, unpublished order of the Court of Appeals, entered May 6, 2014 (Docket No. 318159). Based on the evidence at trial and the record developed during the hearing on remand, we now turn to defendant's arguments on appeal.

III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that he was denied the effective assistance of counsel when defense trial counsel failed to object to, or actually elicited, irrelevant and unfairly prejudicial evidence that defendant was allegedly involved in drug use and drug dealing.

This issue is preserved because a hearing was held pursuant to *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973). "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge must first find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v Dendel*, 481 Mich 114, 124; 748 NW2d 859 (2008) (citation omitted), amended 481 Mich 1201. "This Court reviews for clear error a trial court's factual findings, while we review de novo constitutional determinations." *People v Johnson*, 293 Mich App 79, 90; 808 NW2d 815 (2011) (citation omitted).

There is a presumption that counsel was effective, and a defendant must overcome the strong presumption that counsel's performance was sound trial strategy. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). To establish a claim of ineffective assistance of counsel, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001), quoting *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Furthermore, "[w]hether defense counsel's performance was deficient is measured against an objective standard of reasonableness." *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). Thus, to prevail, a defendant must show that "counsel's representation fell below an objective standard of reasonableness," *Strickland*, 466 US at 688, and he must show that he was prejudiced by counsel's performance, which can be shown by proving that there is a "reasonable

---

[3] Despite being soaked in gasoline, Merritt did not catch himself on fire. When asked if he was able to light his cigarette, Merritt explained: "Yeah, but my finger that was cut off, hanging off, the end of my finger, by doing this it put it out, the cigarette out." The blood from Merritt's missing finger was putting the cigarette out.

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. This Court "will not substitute [its] judgment for that of counsel on matters of trial strategy, nor will [this Court] use the benefit of hindsight when assessing counsel's competence." *People v Unger*, 278 Mich App 210, 242-243; 749 NW2d 272 (2008). The defendant "bears the burden of demonstrating both deficient performance and prejudice[;] the defendant [also] necessarily bears the burden of establishing the factual predicate for his claim." *Carbin*, 463 Mich at 600.

LAURIE DAMON'S DRUG TESTIMONY

First, defendant contends that defense trial counsel improperly elicited testimony from Damon regarding drugs. Specifically, defense trial counsel asked Damon whether she knew defendant, and in response Damon testified that she knew defendant from her "past" because her child's father, Mike Wotring, received pills from defendant. While Damon had never met defendant face-to-face, she was certain that defendant was the same person who knew Wotring and gave him pills some 10 years earlier.

At the *Ginther* hearing, defense trial counsel testified that he "never really thought of Miss Damon as being a critical witness," but defendant "was convinced that she had him . . . confused with another Mr. Cooper." Defense trial counsel further elaborated that defendant is an intelligent person, "and [defense trial counsel] deferred to him thinking that we could elicit that she was somehow biased or confused as to who [defendant] actually was." Defense trial counsel explained that this was why he elicited testimony from Damon that showed she had never actually met the Mr. Cooper that she believed sold drugs to Wilson. Defense trial counsel did acknowledge, however, that "we failed in asserting that she was mistaken."

As stated previously, "[t]here is a presumption that defense counsel was effective, and a defendant must overcome the strong presumption that counsel's performance was sound trial strategy." *LeBlanc*, 465 Mich at 579. Because this Court will not subsitute its judgment for counsel's judgment as it relates to trial strategy, defendant's argument that his trial counsel was ineffective for eliciting prejudicial testimony that defendant was involved in selling drugs fails. *Unger*, 278 Mich App at 242-243. Defense trial counsel attempted to discredit Damon's testimony, pursuant to defendant's requests, by showing that Damon did not actually know defendant and that the Mr. Cooper she knew to be a drug dealer was not the same person as defendant. Thus, trial counsel's performance with regard to questioning Damon was constitutionally effective.[5]

---

[5] Defendant contends that he was prejudiced by this drug related testimony. Pursuant to MRE 402, "All relevant evidence is admissible . . . ." However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." MRE 403. Foreclosing defendant's argument is the fact that defendant, himself, told Luann Bearden, the detective assigned to the case, that he had been heavily using crack cocaine on December 29 and December 30, 2012.

## BEARDEN'S DRUG TESTIMONY

Second, defendant contends that his trial counsel was ineffective for failing to object to the prosecution's questioning of Detective Luann Bearden regarding police searches of two residences associated with defendant which resulted in narcotics being removed from at least one of the location searched.

We initially note that the record is unclear regarding whether drugs were recovered from both locations searched. Rather, the record only reveals that drugs were recovered from the house in which defendant resided. At trial, Bearden testified that during a search of two houses associated with defendant, police recovered some drugs and a blue notebook that belonged to McCarver. It is unclear how this testimony was prejudicial at all given defendant's own unchallenged statements to Bearden that on December 29, 2012, defendant used "a lot" of drugs, including the use of crack cocaine. In other words, even if we rejected defense trial counsel's testimony that this testimony "played into [defendant's] trial strategy," this additional fact was not prejudicial because of defendant's admitted drug use. Consequently, defense trial counsel's failure to object to the prosecution's question does not constitute ineffective assistance of counsel. *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004).

## JESSICA MILLER'S TESTIMONY

Third, defendant contends that his trial counsel improperly "opened the door" to Miller testifying that defendant had previously assaulted her when she was high, prejudicing defendant. Once again, we disagree.

Pursuant to defense trial counsel's questioning, Miller testified that she had worried, in the past, about her safety whenever she did drugs with defendant because defendant had assaulted her when she was high on crack cocaine. At the *Ginther* hearing, defense trial counsel explained that his strategy in questioning Miller was to attack her credibility by focusing on her drug use, particularly her heavy use of crack cocaine, and how it impacted her perception. Also, defense trial counsel explained the decision and strategy in questioning Miller about the time defendant assaulted her:

> I discussed with Mr. Cooper the down side to asking those types of questions. I had some interaction with Miss Miller, I had interviewed her and I had also seen different recorded statements and she was hysterical and her statements often shifted. And part of [the discussion] about the prior alleged assault by Mr. Cooper was to show that she was hysterical and that she, and this was something that Mr. Cooper kind of relayed to me, that she remembered things in this kind of grandiose way and that, you know, after she was not high for a while, that maybe she would remember that it didn't quite happen the way that she perceived it to at the time. So what we were trying to show, and I had actually talked to Miss Miller a little bit about it, is that - - is that there was an assault and that the assault that - - well, that there wasn't an assault; that she believed there was an assault

Thus, defendant's own statements already conveyed to the jury that he was a person who bought and used drugs.

and played it up in her head but now that she was sober she realized that that's not exactly what had happened and that she was hysterical at the time that this thing - - these things were going on. We were trying to attack her credibility.

As part of this strategy trial counsel also elicited testimony from Miller that she was bipolar.

Defense trial counsel's questioning of Miller did allow Miller to testify about her fear of defendant because he had previously assaulted her. However, this was a consequence of the overall trial strategy in questioning Miller—which was to point out Miller's heavy use of drugs and how it affected her perceptions. "A failed strategy does not constitute deficient performance." *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008). Thus, defense trial counsel's performance did not constitute ineffective assistance.

## MCCARVER'S DRUG TESTIMONY

Fourth, defendant contends that defense trial counsel was ineffective for failing to object to McCarver's testimony that defendant was his best customer and purchased $500 to $1,000 worth of crack cocaine each time that he purchased drugs from McCarver.

At trial, the prosecution asked McCarver why he would go with defendant to Merritt's home, and McCarver responded he did so because defendant was his best customer because he purchased between $500 and $1,000 worth of crack cocaine at a time. At the *Ginther* hearing, defense trial counsel explained that he did not object to this line of questioning because it made McCarver's testimony look incredible:

I felt that that particular testimony was - - also played into my client's hands. I also felt that just given the nature of how much money he was talking about that it - - that it - - it made me question Mr. McCarver's credibility and I thought it was doing the same for the jury. It seemed somewhat ridiculous. And I . . . when I was questioning him, the tone in which I was questioning him about that particular issue was somewhat . . . it was more of a, "Really? That's - - that's the type of customer Mr. Cooper is? That seems pretty farfetched." And I believed it to be a way to attack Mr. McCarver's credibility.

Defense trial counsel's decision not to object was trial strategy, based on the idea that McCarver's testimony was unbelievable. Because this Court will not subsitute its judgment for counsel's judgment as it relates to trial strategy, defendant's argument that his trial counsel was ineffective for eliciting prejudicial testimony that defendant was involved in selling drugs fails. *Unger*, 278 Mich App at 242-243.

## FAILURE TO CROSS-EXAMINE MCCARVER

Defendant's final contention is that his trial counsel did not cross-examine McCarver and in particular to point out McCarver's plea deal. Specifically, defendant contends that he was prejudiced by this decision because if McCarver had been cross-examined, it is likely that the jury would have discounted McCarver's testimony about participating with defendant in the attack on Merritt because the jury would have known that McCarver had reduced his exposure from life imprisonment to 10 years.

At the *Ginther* hearing, defense trial counsel admitted that he knew McCarver took a plea bargain, and although he was not sure of the exact charges levied against McCarver, he nonetheless addressed McCarver's plea in his opening statement. McCarver further elaborated:

> [P]art of the rationale was that the prosecutor had elicited the fact that they were taking plea bargains. They all showed up in orange jumpsuits. They all admitted to heavy cocaine use and being a part of this and taking plea bargains already. And part of my trial strategy was to attack other aspects of their credibility. I felt that the jury was very much aware of the fact that they were all there testifying as part of a plea agreement. Like I said, they were all - - every one of them showed up in a prison uniform. Every one of them admitted while the prosecutor was - - during direct examination that they had taken a plea bargain. I didn't focus as much on that because I believed that there were other aspects of their credibility that would benefit us more.

During his opening statement, defense trial counsel stated that some witnesses would lie during trial "to protect their own skin."

It is not entirely clear why counsel did not cross-examine McCarver because he would be wearing his jail clothing even if he did question him, so defendant would get the benefit of McCarver's appearance *and* his being subject to cross-examination. However, this Court "will not substitute [its] judgment for that of counsel on matters of trial strategy, nor will [this Court] use the benefit of hindsight when assessing counsel's competence." *Unger*, 278 Mich App at 242-243. But even if this were an unreasonable trial strategy, defense trial counsel's decision did not prejudice defendant because Merritt identified defendant before trial and at trial as the man who broke into his house and committed these crimes against him. Thus, even without McCarver's testimony, Merritt's powerful identification evidence was still admissible, and defendant was not prejudiced by defense trial counsel's failure to cross-examine McCarver.

## IV. PROSECUTORIAL ERRORS

Defendant also contends that the prosecution committed prosecutorial "misconduct" by bolstering the credibility of two witnesses and that defense trial counsel was ineffective for failing to object to the prosecution's bolstering. Before addressing this claim of error, we once again acknowledge another prosecutor's contention[6] that it is a misnomer to label claims such as this one as "prosecutorial misconduct." This concern for the proper phrase is not a case of mere political correctness, for the term misconduct has a specific legal meaning and connotation when it comes to attorney conduct, and is in general limited to instances of illegal conduct, fraud, misrepresentation, or violation of the rules of professional misconduct. See MRPC 8.4 and *Grievance Administrator v Deutch*, 455 Mich 149, 164; 565 NW2d 369 (1997). Although we

---

[6] See *People v McCrary*, unpublished opinion per curiam of the Court of Appeals, issued June 13, 2013 (Docket. No. 308237).

recognize that the phrase prosecutorial misconduct has become a term of art in criminal appeals,[7] we agree that the term "misconduct" is more appropriately applied to those extreme—and thankfully rare—instances where a prosecutor's conduct violates the rules of professional conduct or constitutes illegal conduct. See, e.g., MRPC 8.4. In the vast majority of cases, the conduct about which a defendant complains is premised on the contention that the prosecutor made a technical or inadvertent error at trial—which is not the kind of conduct that would warrant discipline under our code of professional conduct. Therefore, we agree that these claims of error might be better and more fairly presented as claims of "prosecutorial error," with only the most extreme cases rising to the level of "prosecutorial misconduct."

No matter what operative phrase is used, we must look to see whether the prosecutor committed errors during the course of trial that deprived defendant of a fair and impartial trial. *People v Aldrich*, 246 Mich App 101, 110; 631 NW2d 67 (2001). "Where a defendant fails to object to an alleged prosecutorial impropriety, the issue is reviewed for plain error." *Id.*, citing *People v Carines*, 460 Mich 750, 752-753, 764; 597 NW2d 130 (1999). A plain error is one that is "clear or obvious," and the error must affect the defendant's "substantial rights." *Carines*, 460 Mich at 763. That is, the defendant must have been prejudiced by the plain error. *Id.* "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of defendant's innocence." *Id.* at 763-764 (internal quotations, citation and alteration omitted).

The specific sections of questioning that defendant challenges both relate to the prosecutor questioning its own witnesses about their agreements to testify truthfully in order to obtain a plea bargain from the prosecutor.

PROSECUTION'S QUESTIONING OF MILLER

*Q.* You're here testifying because it was part of a plea offer that I made for you, isn't it?

*A.* Yes.

*Q.* Okay. Jessica, is it true that you pled guilty to a felony with a maximum penalty of up to four years of incarceration?

---

[7] We note that our Court began using this phrase by at least the late 1960s, *People v Bloom*, 15 Mich App 463, 474; 166 NW2d 691 (1969), while the Supreme Court started in the mid-1970s. See *People v Hammond*, 394 Mich 627, 630; 232 NW2d 174 (1975) (opinion by KAVANAGH, C.J.). In its earlier decisions our Supreme Court appears to have addressed these claims as claims that there was error warranting reversal and not as prosecutorial misconduct. See, e.g., *People v Allen*, 351 Mich 535, 544; 88 NW2d 433 (1958) (reviewing the "ground of error" premised on the prosecutor's admittedly "intemperate and perhaps better left unsaid" remarks).

*A.* Yes.

*Q.* And that was a plea reduction from what you were originally charged with, isn't it?

*A.* Yes.

*Q.* Okay. And what were the conditions of that plea offer that I made to you?

*A.* That I testify truthfully.

*Q.* Okay. Now, Jessica, you and I had a chance to talk prior to you coming in here and testifying today, didn't we?

*A.* Yes.

*Q.* Okay. And what did I tell you to do?

*A.* Just to be honest.

*Q.* Okay. And you understand that that condition of your plea bargain is that you must testify truthfully; is that true?

*A.* Yes.

PROSECUTION'S QUESTIONING OF MCCARVER

*Q.* Mr. McCarver, I notice that as you sit there to testify today you are in oranges with handcuffs, is that true?

*A.* Yes, sir.

*Q.* Okay. And is it also true that you're currently incarcerated at the Lenawee County Jail?

*A.* Yes.

*Q.* And that's a result of a guilty plea that you entered this week on this matter, is that true?

*A.* Yes, sir.

*Q.* Okay. Is it also true, sir, that I made a plea agreement with you whereby I reduced the charges that you were facing at that time down to a felony charge that you pled guilty to that has a maximum sentence of up to ten years of incarceration?

*A.* Yes, sir.

*Q.* Okay. Is it also true, sir, that I did not, I personally, the prosecutor's office, did not make any sentencing agreement with you?

*A.* Yes, sir.

*Q.* Okay. Now, the conditions of that plea agreement is that you come to court to testify against any codefendants, is that true?

*A.* Yes, sir.

*Q.* Okay. Is that what you're here to do today?

*A.* Yes, sir.

*Q.* Okay. Prior to testifying in this courtroom today, sir, is it true that you and I met? We talked?

*A.* Yes, sir.

*Q.* Okay. And what did I tell you to do here today, sir?

*A.* Tell the truth.

*Q.* Okay. And again, that's what you're here to do?

*A.* Yes, sir.

Generally, "prosecutors are accorded great latitude regarding their arguments and conduct." *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (alteration, quotation marks and citations omitted). "Included in the list of improper prosecutorial commentary or questioning is the maxim that the prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness." *Id.* at 276 (citations omitted). The mere disclosure of a plea agreement with a prosecution witness, which includes a provision for truthful testimony, does not constitute improper vouching or bolstering by the prosecutor, provided the prosecutor does not suggest special knowledge of truthfulness. *Id.* Because the prosecution did not make any additional comments about the credibility of Miller and McCarver, there was nothing improper about the prosecutor's questioning. Furthermore, because the prosecution asked no questions of McCarver or Miller that bolstered either witness's credibility, any objection defense trial counsel could have made would have been futile. *Thomas*, 260 Mich App at 457. Thus, defense trial counsel's decision to not object to the prosecution's questioning was constitutionally effective.

Affirmed.

/s/ Christopher M. Murray
/s/ Henry William Saad
/s/ Kirsten Frank Kelly