*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

NEAL PRINCE,

      Defendant-Appellant.

UNPUBLISHED
February 1, 2022

No. 352799
Eaton Circuit Court
LC No. 2019-020124-FC

Before: MARKEY, P.J., and SHAPIRO and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant appeals by right from his convictions by a jury of first-degree murder, MCL 750.316, and carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to serve two years in prison for felony-firearm, consecutive to life in prison without parole for first-degree murder. We affirm.

## I. SALIENT FACTUAL BACKGROUND

This matter arises out of the shooting death of Donovan Barfield during a robbery at Barfield's one-bedroom apartment on the morning of December 14, 2018. At approximately 4:30 a.m., one of Barfield's neighbors heard gunshots from two different guns. At the time of the shooting, Barfield was permitting his friend Joe Woods to stay with him on an air mattress. As it turned out, Woods had an all-in-one desktop computer that he used for music production, and which was equipped with a webcam and a surveillance program that would automatically record video when it detected movement. On the night of the shooting, Woods stayed with his ex-girlfriend. He returned to Barfield's apartment at 8:15 the next morning to discover the apartment door unlocked, which was unprecedented. He also noticed that part of the "buzzer" used to enter the apartment had been pried apart. Woods then discovered the entire apartment in extreme disarray, blood on the wall, and Barfield on the floor under the air mattress. Woods checked Barfield for life and found him stiff and cold to the touch. Woods collected his computer and fled.

Woods set his computer up at a friend's house and checked his surveillance program. At some point, the webcam captured an image of Woods playing a game on the bed while wearing a gold necklace with a cross pendant. Shoe boxes were visible in the room's closet. The webcam

-1-

also recorded videos on the night that Barfield was killed. One video showed that at 4:25 a.m. on December 14, 2018, Barfield entered the room and lifted the mattress. He paced through the bedroom while using a phone, apparently in communication with someone. At 4:29 a.m., Barfield again entered the bedroom wearing the clothes in which he was found dead. Barfield's phone was on; his mouth was moving, and he was looking over his shoulder as if he were talking with someone. A third video at 4:31 a.m. showed two people going through the bedroom with no care as to where things ended up. At 4:31:42 a.m., one person's face appeared close to the camera, showing a distinctive wash pattern on his denim pants, dark and curly hair poking out from under his hood, and a glove on his right hand. At 4:32 a.m., the video showed the second person holding a shiny silver semi-automatic pistol and a pair of tennis shoes. At 4:32:08 a.m., the first person flipped over the bed. At 4:32:52 a.m., a third person entered the room. Woods testified[1] that he did not recognize any of the suspects in the video.

Woods did not initially tell police about the surveillance videos because he did not want to be involved. However, he contacted Barfield's mother using videoconferencing software and showed Barfield's mother the videos. Barfield's mother took a screenshot of the video and, at some point, posted it on social media. Woods summoned the police to Barfield's apartment because he was concerned about how long it might otherwise take for someone to discover Barfield's body. The police who responded believed that the disarray in which Barfield's apartment was found indicated that someone had been searching for something. Barfield died of at least six gunshot wounds—four to his abdomen and two to his head. Woods asked a friend to hold onto his computer, and the friend, of her own volition, hid the computer in the back yard of someone else she knew, without that person's knowledge. Eventually, Woods agreed to discuss the videos with the police, whereupon the friend retrieved the computer and placed it directly in front of a waiting police car. The friend testified that she never turned the computer on or otherwise tampered with it, and Woods also denied altering any videos.

Numerous electronic messages from, to, or involving defendant were admitted into evidence. Several days before the shooting, defendant had expressed a need to get money, possibly by committing a robbery. A few days before the shooting, a bank had been robbed in DeWitt, and shortly before the shooting, one of the other people involved in the shooting, Anthony Brown, messaged Barfield, suggesting the possibility of making money from the robbers.[2] Also shortly before the shooting, another person sent a message to defendant suggesting that $15,000 was "on the table." At 6:25 a.m., defendant responded to that message, saying, "I been duckin'. I did some crazy ass shit. Will tell you when I see you in person. Can't even totp [talk on the phone]."

Sixteen-year-old SL testified that in the early morning of December 14, 2018, he was at a friend's house, along with a man named Tim Haliburton, playing video games. SL testified that defendant and one of the other people involved in the shooting, Willie Fletcher, arrived with multiple shoe boxes and a gold chain with a cross pendant. SL opined that defendant's demeanor

---

[1] As will be discussed, one of the issues in this matter is that Woods testified at the preliminary examination, but because he was unavailable at trial, his preliminary examination testimony was provided to the jury instead.

[2] Barfield's only known source of income was from "shooting dice," a form of street gambling.

was unusual, because normally he was talkative and funny, but on this occasion, defendant was quiet. SL purchased one pair of shoes and inquired into their origin. He testified that defendant "said somethin' about somebody getting shot." According to SL, defendant and Fletcher explained that they and Brown went to Barfield's apartment to have a dice game, then returned to their car and talked about a plan to rob Barfield. SL recounted that when Barfield turned around, Fletcher shot him once in the back and Brown shot him twice in the head. Defendant said that he looked around the apartment for money and whatever he could find, including black-and-peach Nike Foam shoes and a brown leather bag.

Over the next 13 days, defendant messaged eight people to see if they would be interested in buying the shoes or the bag. Defendant also posted a picture of himself wearing the black-and-peach Nike Foams and the gold cross pendant. Two of defendant's friends contacted him about the screenshot taken of the surveillance video and told defendant that it looked like him. Defendant denied that he was the man in the video, but he messaged several more people about it. On December 22, 2018, in a Facebook messenger conversation, defendant said: "That shit was fun. No cap [lie]. I got to do it again but this time I got to do it . . . I wanted to do it so bad but he was starin' at me the whole time the first time."

Detectives obtained a warrant to search defendant's apartment and found the black-and-peach Nike Foams, the brown leather bag, the gold cross pendant, and a sweatshirt and pair of jeans that matched the attire of the suspect on the surveillance video. Defendant told detectives that he purchased the shoes and pendant on "Letgo," an app that allows users to buy and sell items online. However, defendant could not provide any details about the alleged seller of the items, and he gave detectives an e-mail address that was not registered to a Letgo account.

Defendant was charged with open murder and felony-firearm. At defendant's trial, the prosecutor informed the trial court that Woods could not be located despite the court's issuance of a material witness warrant. A detective with the Lansing Police Department testified that officers had attempted to serve Woods with multiple subpoenas at two of his known addresses, conducted surveillance at both addresses, contacted his last known phone number, contacted his known associates, and monitored social media; but they were unsuccessful. Although Woods listed on his Facebook profile that he lived in Dallas, Texas, multiple recent posts by Woods referenced Lansing. Regardless, the prosecutor checked the online system for the Dallas Texas city jail, but found no record of Woods being incarcerated there. The prosecutor explained that before the preliminary examination, Woods had been arrested in Arizona; nevertheless, Woods had arranged through his attorney to come to Michigan to testify. The prosecutor contacted Woods's attorney twice in the weeks leading up to trial, and Woods's attorney assured the prosecutor that Woods would call. However, Woods never called. The prosecutor asked the trial court to rule that Woods was an unavailable witness under MRE 804 and that Woods's preliminary examination testimony be played for the jury. The trial court agreed.

Additionally, the prosecutor requested that the trial court provide transcripts of Woods's preliminary examination testimony to the jury so the jury could read along while listening to the recording. Defense counsel objected, arguing that the jury could give more weight to Woods's preliminary examination testimony if it were in transcript form. The trial court stated that it would "make a ruling on that when we take our next break," but did not make any ruling on the record. However, when the court came back on the record, the judge stated that "based on a ruling,

[Wood's testimony] is gonna be [presented] through transcripts." The trial court instructed the jury to give Woods's testimony the same consideration as other witness testimony, and it provided the jury with one copy of the transcript for deliberation, which the judge stated would be marked as an exhibit.

At trial, the prosecutor called SL to testify. SL initially testified that he was facing 15 to 20 years in prison for "[a] lot" of armed robbery charges, but he had accepted a proffer agreement with the prosecutor's office for 60 months in prison if he testified at defendant's trial. Defense counsel outlined SL's charges one by one, and SL acknowledged that he was charged with 17 charges in Ingham County, more than half of which carried a penalty of life or any term of years, as well as two more charges in Eaton County that carried a potential sentence of life or any term of years. SL explained that he did not want to testify, but he felt pressured by the agreement, saying, "I don't want to do none of this, for real, but it's just like, I don't know, this or life, basically." During closing argument, defense counsel argued that SL was motivated "to tell what the prosecutor wanted him to tell" to "go from 10 life offenses down to 60 months." Defense counsel also argued that SL's story was not corroborated because the other individuals who were there when defendant and Fletcher confessed were not called as witnesses. In his rebuttal argument, the prosecutor argued that SL was facing 15 to 20 years' imprisonment, not the rest of his life:

> The defense wants you to not believe [SL] because he has this thing that he wanted to get less time. Remember, too, that he's a 16-year-old kid. Remember, too, that he said he was looking at 15 to 20 years. Not the rest of his life, 15 to 20 years. And that's time. And he's still doin' five years. That's time that he has—the fact that he has snitched over his head, or he's with people that can find out that he snitched. You gonna do that for a lie?

At the close of trial, the trial court instructed the jury that the attorneys' statements were not evidence. The jury found defendant guilty of first-degree murder and felony-firearm.

After trial, defendant filed a motion for an appointment of a computer forensic expert, arguing that because Woods's computer and the surveillance videos were not initially disclosed to police, the computer should have been examined to determine if any video was altered or deleted. Defendant also filed a motion for a new trial and a motion for a *Ginther*[3] hearing, arguing that his trial counsel was ineffective for failing to object to the introduction of Woods's preliminary examination testimony, not hiring a computer forensic expert, and failing to impeach SL with his prior police interviews. The trial court denied all motions.

## II. STANDARDS OF REVIEW AND PRINCIPLES OF LAW

Defendant preserved his claim of ineffective assistance of counsel by filing a motion for a new trial and a *Ginther* hearing. *People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973); *People v Sabin*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000). Ineffective-assistance claims are mixed questions of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

We review a trial court's findings of fact for clear error and review questions of law de novo. *Id*. Because the trial court denied defendant's motion for an evidentiary hearing, "our review is limited to the facts on the record." *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000). However, we will consider materials not in the record for the limited purpose of determining whether to remand the matter for an evidentiary hearing. *People v Moore*, 493 Mich 933, 933; 82 NW2d 580 (2013).

To establish that counsel was ineffective, defendant must overcome the strong presumption that counsel engaged in sound strategy and show that counsel's performance was objectively deficient; defendant must also show a reasonable probability that a different outcome would have resulted but for counsel's deficient performance. *People v Armstrong*, 490 Mich 281, 289-290; 806 NW2d 676 (2011). This Court will generally not second-guess tactics of trial strategy, such as decisions concerning what evidence to present and which witnesses to call. *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

"We review a trial court's determination of due diligence and the appropriateness of a 'missing witness' instruction for an abuse of discretion." *People v Eccles*, 260 Mich App 379, 389; 677 NW2d 76 (2004). We review for abuse of discretion a trial court's decision to admit evidence. *People v Adams*, 233 Mich App 652, 656; 592 NW2d 794 (1999). "[W]hether the admission of evidence would violate a defendant's constitutional right of confrontation is a question of law that we review de novo." *People v Dinardo*, 290 Mich App 280, 287; 801 NW2d 73 (2010). We review for abuse of discretion a trial court's decision to give transcripts to a jury to review. See *People v Fetterley*, 229 Mich App 511, 520; 583 NW2d 199 (1998).

Defendant did not preserve his claim of prosecutorial misconduct[4] by raising it in the trial court. See *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994). In reviewing a claim of prosecutorial misconduct, "we must look to see whether the prosecutor committed errors during the course of trial that deprived [the] defendant of a fair and impartial trial." *People v Cooper*, 309 Mich App 74, 88; 867 NW2d 452 (2015). "On review, this Court examines the pertinent portion of the record and evaluates the prosecutor's remarks in context in order to determine whether the defendant was denied a fair and impartial trial." *People v Legron*e, 205 Mich App 77, 82-83; 517 NW2d 270 (1994). Closing arguments are reviewed as a whole in evaluating the propriety of specific remarks. *People v Johnson*, 187 Mich App 621, 625; 468 NW2d 307 (1991). We review a defendant's unpreserved claim of prosecutor error for plain error

---

[4] Most claims presented as prosecutorial misconduct are in substance truly claims of prosecutorial error. The distinction is whether the prosecutor allegedly engaged in conduct more akin to fraud, illegality, or a violation of the rules of professional conduct rather than a technical mistake or inadvertent omission. *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). Because defendant alleges that the prosecutor intentionally misrepresented facts to the jury, the term "misconduct" is appropriate here, even though we ultimately disagree with defendant's characterization of the prosecutor's conduct. In any event, the same standard of review applies to either "misconduct" or "error." *Id*. at 88.

affecting substantial rights. *People v Abraham*, 256 Mich App 265, 274; 662 NW2d 836 (2003). A plain error affects a defendant's substantial rights if the error "affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

## III. COMPUTER FORENSIC EXPERT WITNESS

Defendant first argues that he received ineffective assistance of counsel because counsel failed to retain a computer forensic expert. Defendant contends that such an expert would have discovered four corrupted and unplayable video files on Woods's computer, and those files were crucial to the defense. We disagree.

Defendant has provided us with an affidavit from Donald A. Smith, a computer forensic examiner.[5] Smith avers that there were four additional video files recorded at around the time of the shooting, but the files were unplayable because they were corrupted. Smith opined that "[t]he cause of this video file corruption is currently unknown and can be caused by, but not limited to, the following factors: equipment deterioration, user manipulation, environmental factors, video file degradation, computer virus, editing of video file, playing of video file, transferring of video file," and he had not ruled out any of the preceding possibilities. Defendant argues that the corrupted video files are therefore evidence that someone might have edited or deleted some of the surveillance videos.

To the contrary, Smith's affidavit clearly reveals that defendant's argument is speculative, and the corruption could be explained by a number of innocent misfortunes. For example, "equipment deterioration" and "environmental factors" are plausible given that Woods's friend hid the computer in someone's back yard in the middle of a Michigan winter. More importantly, we have been provided with nothing to suggest any tampering of the videos actually played for the jury. We have also been provided with nothing to suggest that the corrupted videos might have been recoverable, nothing to suggest that any videos were deleted, and nothing to suggest that any potentially exonerating video evidence ever existed. Even if the corrupt videos had been edited, the editing was obviously unsuccessful, and it would not affect the reliability of the other surveillance videos that were admitted at trial, one of which showed defendant ransacking Barfield's bedroom shortly after the murder. There is no indication that expert testimony would have aided with defendant's theory of defense, so defendant has not shown that his trial counsel's actions fell below an objective standard of reasonableness for failing to retain a computer forensic expert.

---

[5] Although this affidavit was not provided to the trial court, as noted, we will consider materials submitted by defendant for the limited purpose of determining whether to remand for an evidentiary hearing. *Moore*, 493 Mich at 933. Furthermore, this Court may, "in its discretion, and on the terms it deems just[,] . . . permit amendments, corrections, or additions to the transcript or record." MCR 7.216(A)(4). Because the affidavit was not available until after the trial court entered its order denying defendant's motions, and because the law generally does not favor requiring parties to perform impossibilities, see *Lee v Marsh*, 19 Mich 11, 13 (1869), we would find it proper to consider the affidavit in any event.

## IV. WOODS'S PRELIMINARY EXAMINATION TESTIMONY

Defendant next presents several related arguments generally challenging the admission of Woods's preliminary examination testimony and written transcripts of that testimony. More specifically, defendant contends that the prosecutor did not demonstrate due diligence in attempting to procure Woods for trial; the admission of Woods's preliminary examination testimony violated his Sixth Amendment right of confrontation; the provision of a transcript of Woods's preliminary examination testimony during jury deliberation was erroneous because the transcript was not admitted into evidence; and trial counsel was ineffective for failing to make certain objections or to impeach Woods. We disagree.

## A. DUE DILIGENCE

" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Unless an exception applies, hearsay is not admissible as evidence. MRE 802. One such exception is outlined in MRE 804(b)(1), which provides, in relevant part:

> The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> *Former testimony*. Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

A witness can be deemed unavailable if the witness "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means, and in a criminal case, due diligence is shown." MRE 804(a)(5). Due diligence requires a "diligent good-faith effort" to find the declarant. *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). Whether a prosecutor has satisfied due diligence is a question of reasonableness "and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it." *Id*. In other words, "due diligence" does not turn on "the bare fact that a party could have expended greater efforts." *Ickes v Korte*, 331 Mich App 436, 443 n 3; 951 NW2d 699 (2020).

As discussed above, the police and prosecutor engaged in extensive efforts to contact Woods. The gravamen of defendant's argument is that they could have done more, which, as noted, is not the standard. Defendant contends that the police and prosecutor should have checked whether Woods was in Arizona or Texas. However, we have neither found nor been presented with evidence suggesting that Woods had returned to Arizona. Similarly, although Woods's Facebook account stated that he lived in Dallas, Texas, multiple references on his account to Lansing suggested that he was still living in Michigan. Regardless, the prosecutor showed due diligence by checking the Dallas City Jail's online system to see if Woods had been incarcerated there. The prosecutor showed due diligence in attempting to procure Woods's attendance under

MRE 804(a)(5). Therefore, it would have been futile for trial counsel to object to the admission of Woods's testimony on that basis. *Ericksen*, 288 Mich App at 201.

## B. CONFRONTATION CLAUSE

Defendant next argues that the introduction of Woods's preliminary examination testimony at the trial violated his Sixth Amendment right of confrontation. Both the United States and Michigan Constitutions guarantee that a criminal defendant has the right to confront the witnesses against him. US Const, Am VI; Const 1963, art 1, § 20. MRE 804(b)(1) provides that the former testimony of an unavailable witness is admissible "if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." To determine whether a party had a similar motive to examine a witness at the prior proceeding, a court may consider several factors, including:

> (1) whether the party opposing the testimony had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue; (2) the nature of the two proceedings—both what is at stake and the applicable burden of proof; and (3) whether the party opposing the testimony in fact undertook to cross-examine the witness (both the employed and available but forgone opportunities). [*People v Farquharson*, 274 Mich App 268, 278; 731 NW2d 797 (2007) (quotation marks and citation omitted).]

"Because MRE 804(b)(1) is a hearsay exception firmly rooted in American jurisprudence, the Confrontation Clause is satisfied when the complainant's prior testimony is [properly] admitted because that testimony bears satisfactory indicia of reliability . . . " *Adams*, 233 Mich App at 659-660.

Defendant argues that his trial counsel did not have a similar motive and opportunity to question Woods at the preliminary examination because defense counsel did not know about the existence of the four corrupt video files during the preliminary examination, so he could not properly cross-examine Woods. We agree in part that because counsel did not know about the four corrupt video files, he did not have the opportunity to cross-examine Woods regarding those files. However, because the four corrupted files did not come to light until after trial, counsel would have had the same lack of opportunity even if Woods had been produced for trial. In any event, as discussed, we have been presented with nothing to suggest that the corrupt files were of any significance, and Woods expressly denied altering the videos. In all other respects, counsel at the preliminary examination had just as much interest in discrediting Woods's reliability as counsel would have had at trial. The criminal nature of the two proceedings were similar, and defense counsel did cross-examine Woods at the preliminary examination. *Farquharson*, 274 Mich App at 278. Therefore, Woods's prior testimony fits squarely under MRE 804(b)(1) and satisfied the Confrontation Clause. *Adams*, 233 Mich App at 659-660.

## C. FAILURE TO IMPEACH WOODS

Defendant next argues that his trial counsel was ineffective for failing to impeach Woods during the preliminary examination regarding Woods's criminal history and regarding the corrupted video files. We disagree.

As discussed, counsel could not have impeached Woods with information not known to counsel. As also discussed, even if we were to accept that it was objectively deficient performance for counsel not to have retained a forensic computer expert even before the preliminary examination—which we do not—we have not been provided with any indication that the corrupted videos had any relevance or significance.

Furthermore, MRE 609(a) clearly states that defendant's proposed impeachment of Woods would have been impermissible:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall not be admitted unless the evidence has been elicited from the witness or established by public record during cross-examination, and
>
> (1) the crime contained an element of dishonesty or false statement, or
>
> (2) the crime contained an element of theft, and
>
> (A) the crime was punishable by imprisonment in excess of one year or death under the law under which the witness was convicted, and
>
> (B) the court determines that the evidence has significant probative value on the issue of credibility and, if the witness is the defendant in a criminal trial, the court further determines that the probative value of the evidence outweighs its prejudicial effect.

Defendant does not assert that Woods was convicted of a crime that contained an element of dishonestly, a false statement, or theft that would implicate his credibility as a witness. There is also no indication that a prior conviction was relevant to Woods's testimony about the surveillance system on his computer or his discovery of Barfield's body and the ransacked apartment. Therefore, defense counsel was not ineffective for failing to make a futile attempt to impeach Woods using tactics that would not have been allowed. *Ericksen*, 288 Mich App at 201.

## D. TRANSCRIPTS OF WOODS'S TESTIMONY

Defendant next argues that the trial court erred by allowing the jury to view Woods's preliminary examination transcripts during deliberation because the transcripts were not admitted into evidence. We agree that the trial court erred by failing to make a record of its ruling admitting the transcripts into evidence. However, the record unambiguously shows that the trial court did actually make that ruling. Therefore, although the trial court should have made a more careful record, the testimony was properly considered evidence.

Defendant argues that it was prejudicial to allow the jury to view Woods's preliminary examination transcript during deliberations because the written transcripts unfairly added an extra level of credibility and importance to his statements. The fact that Woods did not testify in person at trial already marked his testimony as abnormal, and the provision of a transcript would have obviated the need for the jury to rely on memory alone regarding Woods's testimony. However, nothing about the provision of the transcripts connotes any greater degree of credibility, and we

are unpersuaded that the jury would necessarily have given Woods's testimony more emphasis. Further, there is no indication that the transcript contained any misleading or inadmissible evidence.

In *People v Page*, 41 Mich App 99, 102-103; 199 NW2d 669 (1972), this Court held that the introduction of the entire preliminary examination transcript to a jury was error requiring reversal because it included several informal and inadmissible discussions, including conversations about the defendant's bail. Furthermore, this Court noted, "we cannot conceive of a situation where the entire transcript of a preliminary examination would be admissible into evidence at trial." *Id*. at 102. By contrast, in this case, the jurors were not given the entire preliminary examination transcript. Rather, they were limited to the transcript of Woods's testimony, which was fully admissible. Furthermore, the trial court specifically instructed the jurors to consider Woods's testimony as they would the testimony of any other witness. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *Abraham*, 256 Mich App at 279. Therefore, the trial court did not err by providing the jury with a copy of the transcript during deliberations.

## V. IMPEACHMENT OF SL'S TESTIMONY

Defendant next argues that his trial counsel was ineffective for failing to impeach SL with prior inconsistent statements to police and for failing to call Haliburton as a witness. Failure to impeach a witness can constitute ineffective assistance of counsel when the decision to forgo such impeachment is not supported by reasonable professional judgment. See *People v Trakhtenberg*, 493 Mich 38, 54-55; 826 NW2d 136 (2012). We disagree that counsel was ineffective here.

Defendant argues that trial counsel should have impeached SL with inconsistent statements that he gave to police during his two proffer interviews conducted on March 20, 2019, and April 18, 2019. Defendant argues that SL's trial testimony contradicted his first proffer interview. However, the substance of SL's interviews was nearly identical. In both interviews and at trial, SL described that defendant, Fletcher, and Brown went to play dice with Barfield, planned to rob Barfield, shot him, ransacked his apartment, and stole shoes and the gold chain. Although SL did not indicate that defendant told him about the robbery during the first proffer interview, this was not an inconsistent statement because he did not discuss the context of how he learned about the robbery. At most, defendant's trial counsel could have impeached SL with his statement that he "stretched the truth" during the first proffer interview when he indicated that Brown forced Fletcher to commit the robbery. However, defense counsel's decision not to impeach SL with this statement was reasonable trial strategy because if he had, it would have opened the door for the prosecutor to highlight the consistencies between the two proffer interviews and SL's trial testimony, which would have bolstered SL's credibility. Therefore, defense counsel's decision not to introduce evidence of SL's proffer interviews was reasonable trial strategy and defense counsel was not ineffective.

Defendant also argues that his trial counsel was ineffective for failing to call Tim Haliburton as a witness. SL testified that Haliburton was present when defendant and Fletcher told him the details of the robbery and murder. Therefore, defendant argues that Haliburton was the only witness that could corroborate SL's testimony about what defendant told him. However, defendant has made no offer of proof to show that Haliburton's testimony would have been

beneficial to the defense. There is no indication that Haliburton would have contradicted SL's testimony, and if he corroborated SL's account of defendant's confession, it would have made SL appear more credible. Therefore, defense counsel's decision to not call Haliburton as a witness was reasonable trial strategy.[6]

## VI. PROSECUTORIAL MISCONDUCT

Defendant argues that the prosecutor denied him a fair trial by intentionally misrepresenting the benefit of SL's plea agreement and vouching for his credibility during closing arguments. Defendant also argues that his trial counsel was ineffective for failing to object to the prosecutor's remarks during his closing argument and not asking the trial court for a clarifying instruction. We disagree.

In general, prosecutors "have a duty to see that defendants receive a fair trial while attempting to convict those guilty of crimes." *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996). A "prosecutor is permitted to argue the evidence and all reasonable inferences arising from it." *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). However, "the prosecutor cannot vouch for the credibility of his witness to the effect that [the prosecutor] has some special knowledge concerning a witness' truthfulness." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). The prosecutor may reference a plea agreement containing a promise of truthfulness, provided that the agreement is not "used by the prosecution to suggest that the government had some special knowledge, not known to the jury, that the witness was testifying truthfully." *Id.* (quotation omitted).

As discussed, during closing argument, defense counsel argued that SL testified in exchange for a reduction of ten life sentences to sixty months. On rebuttal, the prosecutor argued that in fact SL was "looking at 15 to 20 years. Not the rest of his life, 15 to 20 years." Defendant argues that the prosecutor's statement misrepresented the facts because SL's plea agreement included guilty pleas to felonies punishable by life or any term of years. As the prosecutor points out, none of those felonies were punishable by life without parole. More importantly, SL repeatedly testified, despite vigorous cross-examination into his many charges, that he had been facing fifteen to twenty years before he entered into the plea agreement even though some of his charges could have resulted in life sentences. He also indicated that he faced some charges in other counties, but he only had a plea agreement in Ingham County. As a consequence, although both closing arguments omitted certain details, neither could be considered a misrepresentation of the evidence.

Defendant also argues that the prosecutor erred by suggesting that SL was less likely to lie because he was risking his life by "snitch[ing]" on defendant. This argument does not suggest that

---

[6] Defendant also thinks it significant that his trial counsel's license to practice law had, at one point, been temporarily suspended. Counsel's license was suspended for reasons unrelated to his competence as an attorney, and it had been reinstated for more than five years by the time of trial. Counsel apparently made a mistake in his personal life, but the State Bar found that he paid in full for that mistake, and nothing in the record or submitted to us by defendant suggests that counsel was anything less than competent.

the government had some special knowledge that SL was testifying truthfully. *Bahoda*, 448 Mich at 276. Rather, it was a reasonable inference based on SL's testimony that he had been housed in the Ingham County youth facility with Fletcher, and that he did not want to testify, but felt he had little choice. Further, defendant has not shown that this argument affected the outcome of trial. The jurors were instructed that the attorneys' arguments were not evidence; and other evidence strongly supported defendant's conviction, such as the surveillance video, defendant's statements on Facebook, and defendant's attempts to sell the items stolen from Barfield's apartment.

Defendant also argues that his trial counsel was ineffective for failing to object to the prosecutor's closing argument and for not asking the trial court to give a clarifying instruction to the jury regarding SL's plea agreement. Because the prosecutor's statements in his rebuttal argument were neither error nor misconduct, defense counsel was not ineffective for failing to raise a futile objection. *Ericksen*, 288 Mich App at 201. The Michigan Supreme Court has also recognized that "there are times when it is better not to object and draw attention to an improper comment." *Bahoda*, 448 Mich at 287 n 54. In this case, it was reasonable trial strategy for trial counsel not to object to the prosecutor's brief statements and draw more attention to them. It was also reasonable trial strategy for defense counsel to not request an additional jury instruction regarding SL's plea agreement. There is no indication that the trial court would have agreed to such an instruction because the jurors were already instructed that they could not consider the attorneys' statements as evidence, and the jurors had heard in detail the sentences that SL was facing if he did not accept the proffer. Therefore, defense counsel was not ineffective for failing to make a futile request. *Ericksen*, 288 Mich App at 201.

Affirmed.

/s/ Jane E. Markey
/s/ Douglas B. Shapiro
/s/ Amy Ronayne Krause