*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A. WHITE, Minor.

UNPUBLISHED
May 19, 2022

No. 358115
Roscommon Circuit Court
Family Division
LC No. 20-725143-NA

*In re* BAIRD/WHITE, Minors.

No. 358180
Roscommon Circuit Court
Family Division
LC No. 20-725143-NA

Before: GADOLA, P.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

In Docket No. 358115, respondent-father appeals as of right the trial court's order terminating his parental rights to AW pursuant to MCL 712A.19b(3)(b)(*i*) and (b)(*ii*). In Docket No. 358180, respondent-mother appeals as of right the trial court's orders terminating her parental rights to AW and to an older child, KB, also pursuant to MCL 712A.19b(3)(b)(*i*) and (b)(*ii*).[1] We affirm the trial court's termination of respondent-father's and respondent-mother's parental rights to AW, but reverse the trial court's termination of respondent-mother's parental rights to KB and remand for further proceedings.

---

[1] At the time of termination, KB resided with her father, who is not a party to this appeal. This Court consolidated respondents' appeals to advance the efficient administration of the appellate process. *In re White*, *In re Baird/White*, unpublished order of the Court of Appeals entered September 28, 2021 (Docket Nos. 358115; 358180).

# I. FACTUAL BACKGROUND

On October 30, 2020, the Department of Health and Human Services (DHHS) petitioned for the removal of AW, who was then almost four months old, from respondents' home. The petition alleged that an investigation by Child Protective Services (CPS) revealed that AW had sustained bruising to her lower left jaw and above her left ear, and had 16 rib fractures that were in various stages of healing. The rib fractures were described as compression fractures, usually thought to be caused by squeezing or compression of the child's chest. DHHS filed an amended petition shortly thereafter seeking termination of respondents' respective parental rights to AW pursuant to MCL 712A.19b(3)(b)(*i*) or (b)(*ii*) because of physical abuse of AW and failure to prevent the abuse. DHHS alleged among other factual allegations that a pediatrician and internal medicine doctor of the Center for Child Protection of the Helen DeVos Children's Hospital examined AW and found that the infant child suffered 16 rib fractures in different stages of healing and that genetic testing determined that AW had no bone-fragility disorders and found no concerns for such disorders. Because no credible explanation had been given for the injuries, the doctor concluded that the totality of the injuries were indicative of nonaccidental trauma which confirmed a medical diagnosis of pediatric physical abuse. The amended petition also alleged that petitioner had serious concerns about the safety of approximately 10-year-old KB, respondent-mother's older daughter, because, if respondent-mother could not keep AW safe, she likely could not keep KB safe. The amended petition, however, did not allege that KB had ever suffered any abuse or neglect.

Dr. Yvonne Rekeny, an expert in child abuse and neglect and who was consulted on AW's case, testified during the termination hearing that the injuries were highly indicative of child abuse. Dr. Rekeny also testified that her team considered and ruled out various disorders and genetic defects, such as osteogenesis imperfecta or fragile bone disorder, as a contributory factor to AW's injuries. Dr. Rekeny explained that the manner of mechanism of injury that respondents presented did not account for AW's injuries. The trial court found that petitioner presented clear and convincing evidence to support termination of respondent-father's and respondent-mother's respective parental rights to AW under MCL 712A.19b(3)(b)(*i*) or (b)(*ii*). The trial court further ruled that these grounds also supported termination of respondent-mother's parental rights to KB. The trial court found that termination of respondents' respective parental rights served AW's best interests, and that termination of respondent-mother's parental rights to KB served that child's best interests.

## II. RESPONDENT-FATHER'S APPEAL (DOCKET NO. 358115)

### A. STATUTORY GROUNDS FOR TERMINATION

Respondent-father first argues that the trial court clearly erred by finding that clear and convincing evidence established a statutory ground for termination of his parental rights to AW. We disagree.

We review for clear error a trial court's ruling that a statutory ground for termination has been proved by clear and convincing evidence and its ruling that termination is in the children's best interests. *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). "A finding is clearly

erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *Id*.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5).

In this case, the trial court found that clear and convincing evidence established grounds for terminating respondent-father's parental rights under MCL 712A.19b(3)(b)(*i*) and (b)(*ii*), which authorizes termination in the following circumstances:

> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

> (*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

The record reflects that petitioner presented clear and convincing evidence establishing grounds for termination under MCL 712A.19b(3)(b)(*i*) and/or (b)(*ii*). Petitioner presented the testimony of Dr. Rekeny and other evidence that the nonmobile infant, AW, suffered 16 broken ribs which she sustained over an extended period and on more than one occasion. Dr. Rekeny testified that before AW's arrival at the Helen DeVos Children's Hospital on October 29, 2020, the referring hospital had taken a "full skeletal survey" revealing the rib fractures. The fractures were in different stages of healing, indicating that they occurred at different times. Dr. Rekeny also testified that nothing about the injuries led her to believe that they resulted from picking the child up from a chair, or from toys or other items falling on her as respondents had offered as explanations for the child's injuries. Dr. Rekeny opined that AW had sustained pediatric physical abuse and nonaccidental trauma. Had the injuries been caused by an accident, Dr. Rekeny explained that such severe injuries would result from something delivering a high level of force, such as a long fall or a car accident. Even then, one would not expect to see fractures in different stages of healing. Dr. Rekeny also opined that nonaccidental injures such as these typically would be caused by a forceful blow or kick to the ribs, or a forceful compression of the ribs, where the abuser squeezed or compressed hard on the child's back. Compression near the spine acted as leverage on the ribs, such that they could break on the lateral sides or the back.

Dr. Rekeny also testified that the hospital performed a follow-up skeletal survey two weeks after the initial one which revealed no additional fractures, indicative that the injuries were not the result of any genetic disorder. Had AW had a significant bone-fragility disorder, given that she

had sustained 16 broken ribs in 3 months, Dr. Rekeny would have expected to see additional findings in the more recent survey of which there were none. Dr. Rekeny also testified that if the child had a bone disorder, she would expect to see other fractures, such as long bone fractures, not just fractures to the child's ribs. Dr. Rekeny also provided further explanation of the lack of any genetic disorders that would explain the injuries, which included a discussion of the symptoms of polycythemia or lactose intolerance and AW's paternal grandfather's exposure to Agent Orange. Further, all of the bone surveys done on AW indicated that she had normal bone mineralization for her age. AW's undisputed physical injuries and the medical diagnostic testing elucidated by Dr. Rekeny's testimony support the trial court's determination that the injuries were caused by trauma, rather than a genetic defect or accident. In addition, respondent-mother denied that there were any complications with AW's birth which ruled out birth trauma as a cause.

Respondent-father argues that even if the injuries were caused by trauma, no testimony linked the injuries to his own actions, or respondent-mother's actions, either as a cause of the injuries or a failure to protect. CPS investigator, Stacy Bohnhoff, however, testified that she created a timeline based on the different stages of rib healing as part of the investigation to eliminate other caregivers as persons who could have caused the injuries. This evidence supported a finding that one or both respondents injured the child. Other testimony also supported a determination that one or both respondents knew of the child's injuries but failed to protect AW from abuse. When asked whether the injuries could have occurred without respondents knowing about them, Dr. Rekeny acknowledged that an infant cannot vocalize and can be irritable at times, but testified that the child would have been in pain, would have shown increased irritability, and would have cried at the time of the acute injury. Although respondent-mother testified that she did not notice anything wrong, other than AW becoming fussy after she ate, Bohnhoff testified that respondent-mother told her that AW would sometimes be fussy or cry unconsolably.

Contrary to what respondent-father asserts, petitioner was not required to prove which parent hurt AW and which one failed to protect the child in order to prove this statutory ground for termination. This Court has held that termination of parental rights under MCL 712A.19b(3)(b)(*i*) or (b)(*ii*) "is permissible even in the absence of definitive evidence regarding the identity of the perpetrator when the evidence does show that the respondent or respondents must have either caused or failed to prevent the child's injuries." *In re Ellis*, 294 Mich App 30, 35-36; 817 NW2d 111 (2011). *In re Ellis* involved facts similar to the instant case where

> [t]he [child's] injuries were numerous, highly indicative of child abuse, using a very high force of impact, and inconsistent with any sort of accident. The fact that many of them were in various stages of healing showed that [the child] had suffered multiple instances of abuse over a prolonged time. The physician testified that while the child may not have been crying constantly, he would have shown signs of distress at least periodically through lack of appetite, sleeping more, and increased fussiness. Respondents could not offer any plausible alternative explanation for [the child's] injuries. [*Id.* at 36.]

This Court noted that the respondents-parents had argued "that it is impossible to determine which of them committed this heinous abuse of the minor child." *Id.* at 33. However, this Court explained that the question regarding which parent committed the abuse of the minor child

would be an extremely relevant, and possibly dispositive, concern in a criminal proceeding against either or both of them, but it is irrelevant in a termination proceeding. When there is severe injury to an infant, it does not matter whether respondents committed the abuse at all, because under these circumstances there was clear and convincing evidence that they did not provide proper care. [*Id*. at 33.[2]]

This Court then concluded that the trial court "properly determined that at least one of them had perpetrated the abuse and at least one of them had failed to prevent it; consequently, it did not matter which did which." *Id*. at 35.

The trial court in this case did not clearly err when it found that clear and convincing evidence established grounds for termination of respondents' parental rights under MCL 712A.19b(3)(b)(*i*) or (b)(*ii*), even though which respondent injured AW could not be definitively determined because the evidence established statutory grounds under either subpart. Even if respondent-father did not cause AW's injuries, clear and convincing evidence nevertheless established that he knew of the recurring injuries and failed to protect the child. The same applies to respondent-mother. The trial court, therefore, did not clearly err by finding that clear and convincing evidence established a ground for termination under MCL 712A.19b(3)(b)(*i*) or (b)(*ii*).

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Respondent-father next argues that he is entitled to relief because his trial counsel provided ineffective assistance by failing to obtain all relevant medical records necessary to respond to petitioner's evidence, by failing to consult more than one potential expert witness after the first one he contacted said that he would not be able to help respondents, and by stipulating to the introduction of respondent-father's psychological evaluation report in lieu of calling the report author as a witness. We disagree with all three claims of ineffective assistance.

A claim of ineffective assistance of counsel generally presents a mixed question of fact and constitutional law, with questions of fact being reviewed for clear error and questions of law being reviewed de novo. *In re Mota*, 334 Mich App 300, 318; 964 NW2d 881 (2020). Respondents in parental-rights proceedings are entitled to the effective assistance of counsel, and claims regarding ineffectiveness are reviewed under the same principles that apply in criminal proceedings. *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). To successfully establish a claim of ineffective assistance of counsel, a respondent in child protective proceedings must show "that (1) counsel's performance was deficient, falling below an objective standard of reasonableness, and that (2) the deficient performance prejudiced the respondent." *Id*. "To demonstrate prejudice, a party must show the existence of a reasonable probability that, but for counsel's error, the results of the proceeding would have been different, and a reasonable probability is one that is sufficient to undermine confidence in the outcome." *Mota*, 334 Mich at 319. Counsel is presumed to be effective, and a respondent bears a heavy burden to overcome that presumption. *People v Cooper*,

---

[2] This Court also noted that "[a]lthough published before this case, in *In re VanDalen*, 293 Mich App 120, . . . this panel arrived at the same conclusion as a basis for terminating parental rights under MCL 712A.19b(3)(g) and (j)." *Id*. at 35 n 2.

309 Mich App 74, 80; 867 NW2d 452 (2015). This burden includes establishing the factual predicate for an ineffective-assistance claim. *Id*.

In general, "[d]ecisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). This Court "will not second-guess counsel on matters of trial strategy, nor will we assess counsel's competence with the benefit of hindsight." *Id*. However, "[c]ounsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012) (quotation marks and citation omitted). "[A] sound defense strategy cannot follow an incomplete investigation of the case when the decision to forgo further investigation was not supported by reasonable professional judgment." *Id*. at 55.

### 1. FAILURE TO OBTAIN COMPLETE MEDICAL RECORDS

Preliminarily, the record does not support respondent-father's argument that trial counsel failed to obtain all necessary medical records. Respondent-father claims that his post-termination expert, Dr. Douglas M. Smith, M.D., Ph.D., did not have all of the medical information he needed to form a more complete conclusion in his preliminary report. However, this is refuted by trial counsel's actions and statements in the trial court. Before the hearing, counsel for petitioner informed the court that he would provide "copies of everything the Department has and intends to use at trial." The court stated that it would also entertain late discovery requests if the items sought would be admissible. Before the start of the termination hearing, the trial court stated that it had spoken with counsel off the record and asked the parties whether there were any preliminary matters that needed to be put on the record. Respondents' respective counsel did not raise any concerns, such as an inability to obtain the underlying x-rays or other medical records. In his report, Dr. Smith lists a number of items he reviewed when preparing his report, including AW's birth records, the bone survey, and records from the Helen DeVos Children's Hospital. However, there is no indication that respondent-father's counsel did not have these materials before the termination hearing. Moreover, neither respondent has provided an offer of proof regarding any necessary records that counsel did not have or failed to obtain. The record, therefore, does not support respondent-father's argument that counsel failed to obtain all of the necessary medical records.

### 2. FAILURE TO INVESTIGATE OR OBTAIN EXPERT WITNESSES

Respondent-father also argues that counsel provided ineffective assistance by failing to further investigate other possible favorable expert witnesses after he, or respondent-mother's counsel, spoke with Dr. Blake Bulloch. On the beginning of the second day of the termination hearing, counsel for respondent-mother informed the court that he and counsel for respondent-father had decided not to call any expert witnesses. Counsel explained that they had contacted experts in polycythemia and experts in the causes of rib fractures in infants, and specifically advised the court regarding contacting Dr. Blake Bulloch, "who has published scholarly articles in pediatrics as well as works at the children's hospital in Phoenix and is somewhat of an expert in the area." Counsel explained, however, that they were "[u]nable to secure any who we believe will be helpful to our cause." Counsel for respondent-father agreed. This exchange establishes that respondents' respective counsel had investigated the potential value of an expert witness and

sought out at least one expert and received an unfavorable response. Further, it appears that counsel may have sought out additional experts. Respondent-father essentially argues that counsel should have kept looking. His argument also relies on the belief that Dr. Smith would have been able to help respondents' cause as indicated in his preliminary report.

Respondent-father primarily relies on *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015), in support of his contention that counsel's failure to engage another expert was objectively unreasonable. However, we agree with the trial court that *Ackley* is factually distinguishable from this case. In *Ackley*, our Supreme Court considered whether a defendant's trial counsel performed ineffectively by failing to retain an expert where the defendant was charged with first-degree felony murder and first-degree child abuse after his live-in girlfriend's three-year-old daughter died while in the defendant's care. *Id.* at 384. The defendant's counsel contacted a possible expert witness, but the witness agreed with the prosecution's theory and told counsel that he could provide no help, because he was on the other side of the debate in his field. However, he advised counsel to seek the assistance of a different expert, who not only was on the "opposite" side of the debate, but who was also "significantly more likely to agree with the defendant's claim that the child's death in this case must have been accidental." *Id.* at 390. Counsel ignored the advice and did not contact the suggested witness or any other forensic pathologist with expertise, "rendering [the first expert] his expert by default." *Id.* Our Supreme Court held that defense counsel's decision to "confine his pursuit of expert assistance to [the first witness], a self-proclaimed opponent of the very defense theory counsel was to employ at trial, despite [the witness's] referral to at least one other expert who could provide qualified and suitable assistance to the defendant" was objectively unreasonable. *Id.* at 391. The Court also faulted counsel for failing to consult "readily available" journal articles on the subject or otherwise educate himself or conduct any independent investigation of the medical issues beyond counsel's first consultations. *Id.* at 391.

As the trial court noted, respondents' attorneys in the instant case did the opposite of the defendant's counsel in *Ackley*. Rather than continue to rely on an expert who told the defense he could not be helpful, they chose not to rely on that unhelpful witness. Later they enlisted the aid of another doctor whose proffered opinion consisted mostly of speculative conclusions and relied upon studies that largely were irrelevant to the instant facts. Thus, unlike in *Ackley*, where the scientific debate at issue was both significant and highly controversial and at least one highly qualified expert could have testified on the defendant's behalf, respondent-father has not shown that his post-termination expert would have been helpful in this case. Respondent-father's reliance on *Ackley*, therefore, is misplaced.

While Dr. Douglas Smith's report refers to underlying studies, it is unclear how those studies would have been helpful in this case. Much of Dr. Smith's opinion relies on speculation, or on factual scenarios unrelated to the circumstances of the instant case. For example, when discussing counsel's alleged failure to pursue genetic testing on AW, Dr. Smith relies on a case study of a baby "who suffered multiple fractures before birth, including multiple rib fractures and bilateral fractures of the upper arm or upper leg bones" where the mother had "hypermobility type Ehlers-Danlos syndrome." In this case, AW suffered no other broken bones to support an alternate explanation for the injuries. No evidence established that AW had incurred injury before or during her birth. Further, respondent-mother testified that there were no complications with AW's birth. Respondent-father, who attended AW's birth, also testified that no known issues presented during the actual birth. Moreover, Dr. Rekeny testified that AW's injuries were inconsistent with being

caused during birth because respondents reported that the birth was normal and the multiple rib fractures were in different stages of healing when the child presented at the Helen DeVos Children's Hospital.

Likewise, when discussing bone fragility in relation to a vitamin D deficiency, Dr. Smith discussed one of his own consults in which the child presented with a skull fracture after falling off a couch. That patient had a vitamin D level of 14ng/ml, which is less than half of the low end of the normal range of 30 ng/ml. AW had a vitamin D recorded test result of 33 ng/ml. Upon further examination, the child for whom Dr. Smith provided consultation, had a fractured femur after a number of physicians, particularly a neurosurgeon, examined the patient. Dr. Smith relied on this case to opine that, in contrast to the generally accepted claim by child pediatricians that a vitamin D deficiency without an x-ray showing rickets does not increase the risk of fractures, "it seems unlikely that the neurosurgery resident would have fractures of the femur if the child did not have some degree of bone fragility." Such conclusion is speculative. Although Dr. Smith's observation may be correct that vitamin D levels could change more quickly than bone density, he essentially acknowledged that any conclusion that vitamin D may have played a role in AW's fractures constituted speculation. In addition, Dr. Smith failed to explain how this could occur in light of Dr. Rekeny's testimony that all of the bone surveys done on AW indicated that she had normal bone mineralization for her age. We also agree with the trial court that any comparison to fractures caused by infant CPR is unwarranted.

Dr. Rekeny testified regarding the tests performed on AW to determine whether she had a bone-fragility disorder. Apart from her testimony that even "common" bone-fragility disorders, with rickets being the most common one, were actually "pretty rare," nothing in her findings or the ones she relied on supports a conclusion that AW suffered from any bone disorder. The tests done by Dr. Rekeny and the other DeVos Children's Hospital doctors, included reviewing x-rays of the child's bone mineralization for any abnormalities of the skeletal structure. The hospital also performed laboratory tests to look for a variety of bone-fragility disorders, including checking for a vitamin D deficiency, copper deficiency, whether the child had normally functioning parathyroid activity, calcium levels, and other nutritional factors. The results were all negative. Dr. Rekeny also obtained a genetic consult to evaluate for any concerns of bone-fragility disorders, and all of that workup presented normal or negative results ruling out bone-fragility disorders as a contributor to the rib fractures. When asked why her facility did not test for "all" genetic bone disorders, Dr. Rekeny explained that there are "thousands" of bone disorders and that they "don't check for all bone disorders if there's no evidence or signs or need to do that." Given this testimony, nothing in the laboratory work supported a finding that further genetic testing was needed. Further, respondent-father has not shown that counsel had any other information that would have shed light on whether AW suffered from osteogenesis imperfecta or any other bone-fragility genetic disorder. For example, to the extent that respondents rely on possible inherited genetic defects, respondents have presented no genetic testing of either parent, or other family members, to support a conclusion that further investigation of an inherited genetic disorder was necessary. Further, although only one additional set of x-rays was completed a few weeks after the initial screening, as the trial court noted, no evidence supports a finding that the child had been further injured or sustained any fractures after removal.

Dr. Smith also relied on a study that he maintained rendered unreliable Dr. Rekeny's finding that the fractures were not birth-related. That study divided the appearance of bone

fractures on x-rays into 6 stages of healing over approximately 11 weeks. Dr. Smith maintained that the study supported a finding that some of AW's rib fractures were in stage 6, which permitted estimating the age the fractures between 9 to 11 weeks. He contended that, because fractures could persist with little change for several weeks to months, AW's fractures could be from birth, which occurred 16 weeks before the child presented to the hospital. Dr. Smith, however, acknowledged that it was a "small study and the times are somewhat idealized." Moreover, Dr. Smith did not discuss Dr. Rekeny's determination that some of the fractures appeared to be only one or two weeks old, although difficult to pinpoint the exact ages of fractures.

Dr. Smith's report does not establish that respondents' respective counsel provided ineffective assistance. The trial court noted that Dr. Rekeny consistently stated that the fractures were in different stages of healing, with some "much older" than others. The record evidence and the testimony supported a conclusion that AW's injuries were incurred on different dates, as opposed to being linked to a single event such as her birth. Therefore, as with the genetic information, respondent-father has not shown that counsel provided ineffective assistance by failing to obtain other experts to provide more precise dates of when the fractures occurred.

Respecting the evidence about the ability to observe the injuries in AW, Dr. Smith opined that "[e]ven if the fractures were inflicted on the child, one would not expect that the child would have exhibited significant signs of pain when cared for by the non-offending caretakers or when being examined by [her] doctor." Dr. Smith relied on expert testimony from another court case, but it is unclear whether the facts are comparable. The trial court observed that any birth fractures likely would have been discovered by physicians who were closely monitoring AW during her stay in the neonatal intensive care unit. The evidence presented in this case does not support Dr. Smith's speculative opinions regarding contributing factors to AW's rib fractures. More importantly, Dr. Smith essentially admitted in his report that he could not rule out abuse as the cause of AW's rib fractures.

In sum, nothing in Dr. Smith's report establishes that counsel's failure to investigate or call another expert was objectively unreasonable, or that there is a reasonable probability that the outcome of the proceeding would have been different if an expert, such as Dr. Smith, had been retained and testified on behalf of respondents.

### 3. STIPULATION TO THE PSYCHOLOGICAL EVALUATION REPORT

Respondent-father also argues that trial counsel provided ineffective assistance by stipulating to the introduction of respondent-father's psychological evaluation report without calling the report author as a witness. However, respondent-father has not presented any affidavit or other offer of proof to support a finding that the author's in-person testimony was necessary, would have been helpful, or would have had a reasonable likelihood of affecting the outcome. Moreover, it is apparent that trial counsel strategically decided not to do so. Rather than call the author of the evaluation as a witness, trial counsel cross-examined other witnesses regarding aspects of statements made in the evaluation. During such cross-examination of witnesses, counsel effectively pointed out inaccuracies in the author's predictions regarding respondent-father's potential for rehabilitation. For example, counsel asked caseworker Kristi Root whether the psychological evaluation report stated that respondent-father "is gonna be compliant and cooperative?" She replied, "[N]ot unless he chooses to be," but then admitted that he had been

compliant since the beginning of the case. Root testified that both respondents had been cooperative and had been voluntarily participating in services. She also acknowledged that, even though the report stated that respondent-father had a highly addictive personality, he had not used any controlled substances in the last eight months. When asked whether respondents could benefit from continued services, Root agreed with the report's evaluation that respondent-father could benefit only if he chose to participate and make it a priority and chose to make changes; he would have to "buy into that before it would be" beneficial. She then admitted that respondent-father had been doing so for the last several months, and he had done everything that the caseworkers had asked him to do. Respondent-father's counsel reasonably used cross-examination to clarify portions of the psychological evaluation report that were not unfavorable and to demonstrate that some of the report author's predictions were not accurate.

Moreover, there is no basis for concluding that counsel's stipulation affected the outcome for respondent-father. Respondent-father did not disagree with any of the report's recitation of statements attributed to him during the evaluation. He specifically agreed that he had told the report author that if he lost his daughter, he would become a "loose cannon" and there would be nothing to stop him at that point. He made repeated statements suggesting that he would act irrationally and erratically, would be willing to break the law, and would even become hostile to caseworkers or others. Respondent-father has not established that his counsel's performance fell below an objective standard of reasonableness nor has he demonstrated a reasonable likelihood that the outcome of the proceedings would have been different had his counsel not stipulated to the psychological evaluation report's admission.

C. BEST INTERESTS

Respondent-father next challenges the trial court's determination that termination of his parental rights served AW's best interests. "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). Whether termination of parental rights is in a child's best interests is determined by a preponderance of the evidence. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). Factors to be considered include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id*. at 41-42 (citations omitted). A court may also consider whether it is likely "that the child could be returned to her parents' home within the foreseeable future, if at all." *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014).

In this case, the trial court found that a bond existed between AW and respondents and that both respondents had complied with the parenting skills portion of the case service plan. The court also found that respondents had not missed any parenting-time visits. The court, however, found that evidence established that both AW and KB needed permanency and stability, and that even though AW's current placement might not be permanent, she needed finality in order to know where she would grow up. The court also found that a high probability existed that AW's aunt,

who currently cared for AW, would adopt her, but even if she did not, little difficulty likely existed in finding other adoptive parents given AW's age. The court found that the predictions in respondent-father's psychological evaluation, coupled with his trial testimony, indicated a low probability of respondent-father's rehabilitation. The court also noted that no further injuries to AW had occurred since her removal.

The trial court did not clearly err by finding that termination of respondent-father's parental rights served AW's best interests. The record indicates that neither respondent took responsibility for AW's injuries. The record also establishes that despite being aware that AW had incurred injuries, neither respondent did anything to prevent further injuries to AW over the course of several weeks. The trial court did not err by finding that AW's future safety if returned to respondents could not be assured. Further, although testimony indicated some inaccuracy of the predictions in respondent-father's psychological evaluation report, respondent-father's own testimony demonstrated his volatility and emotional instability. Respondent-father did not refute any of the statements attributed to him during the examination that raised serious concerns about his mental health, and he specifically admitted that he told the report author that if he lost his daughter he would become a "loose cannon" and there would be nothing to stop him. Respondent-father admitted that he would even break the law. The trial court's decision is also supported by testimony that AW was thriving in foster care, and that her foster parents, respondent-mother's sister and her husband, were providing for the child's needs and were willing to consider adoption, even though they were not 100% committed to adoption at the time. Root also testified that the child showed a very high degree of love and affection to both foster parents, and that AW looked to them for comfort and interaction. Moreover, after removal, the child, who had regular well-child examinations, had not suffered any further injury in her new home. A preponderance of the evidence, therefore, supported the trial court's finding that termination of respondent-father's parental rights served AW's best interests.

### III.  RESPONDENT-MOTHER'S APPEAL (DOCKET NO. 358180)

### A.  STATUTORY GROUNDS FOR TERMINATION

In Docket No. 358180, respondent-mother similarly challenges the trial court's findings of statutory grounds for termination under MCL 7l2A.19b(3)(b)(*i*) and (b)(*ii*) claiming that no evidence established which respondent caused AW's injuries or which respondent failed to protect her. For the same reasons discussed in § II(A), we reject these arguments and hold that the trial court did not clearly err when it found that clear and convincing evidence established statutory grounds under MCL 712A.19b(3)(b)(*i*) or (b)(*ii*) for terminating respondent-mother's parental rights to AW. We also conclude, for reasons similar to those explained in § II(C) that a preponderance of the evidence established that termination of respondent-mother's parental rights to AW served AW's best interests. The record indicates that the trial court properly considered and weighed the applicable best-interest factors. The trial court did not err in this regard.

Respecting KB, petitioner relied on the doctrine of anticipatory neglect or abuse. The doctrine of anticipatory neglect or abuse recognizes that " '[h]ow a parent treats one child is certainly probative of how that parent may treat other children.' " *In re AH*, 245 Mich App 77, 84; 627 NW2d 33 (2001) quoting *In re LaFlure*, 48 Mich App 377, 392; 210 NW2d 482 (1973).

Respondent-mother relies on *In re LaFrance*, 306 Mich App 713; 858 NW2d 143 (2014), in support of her contention that the trial court erred by applying the doctrine of anticipatory neglect or abuse in this case respecting her parental rights to KB. In *In re LaFrance*, DHHS petitioned for removal of the respondents' four children because of the urgent medical condition and needs of the youngest child. The child, only several weeks old, had sustained severe dehydration caused by a virus, suffered from cerebral palsy, and also showed signs of chronic subdural hematomas not caused by external trauma. *Id*. at 715-716, 731. This Court held that the trial court erred by relying on the doctrine of anticipatory neglect to find that grounds existed to terminate the respondents' parental rights to the three older children. *Id*. at 715-717, 730. The older children, who ranged in ages from 5 to 12 years, "did not share their infant sister's medical vulnerabilities or inability to articulate personal needs or discomforts." *Id*. at 731. This Court noted that the petitioner had not provided evidence that the respondents' substance-abuse issues affected their ability to parent the older children. *Id*. at 732. This Court explained that "the trial court nowhere suggested, and no evidence was offered to prove, that either respondent had ever abused or neglected any of their three older children." *Id*. at 730. This Court added:

> Moreover, respondents had cared for those children from birth without incident, including any allegation, let alone proof, that they had abused or neglected the three older children at any time. While anticipatory neglect can militate in favor of termination, under the unusual circumstances of this case, the doctrine has little bearing. [*Id*.]

This Court held that the trial court erred by invoking the anticipatory neglect doctrine as ground for termination of respondents' parental rights to the older children. *Id*. at 732.

The instant case presents similar facts. KB is approximately 10 years older than AW and is healthy and a normally developed child. The record indicates that KB had not lived with respondent-mother for several years. Because of housing issues when respondent-mother moved from Flint to Roscommon County, KB resided with respondent-mother's sister but visited respondent-mother. KB later went to live with her father. Root testified that petitioner had concern that KB could be injured if returned to respondents' care because of the injuries that AW had sustained and because KB was too young to protect herself. However, neither Root nor any other witness testified that respondent-mother had ever harmed or neglected KB. Indeed, the trial court did not specifically discuss any allegations or evidence respecting KB.

The trial court applied MCL 712A.19b(3)(b) respecting KB, because a sibling had suffered physical injury. MCL 712A.19b(3)(b) authorizes termination of parental rights to a child, if the child or a sibling of the child has suffered physical injury or physical abuse or sexual abuse under any of the following conditions:

> (i) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

> (ii) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable

-12-

likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

> (iii) A nonparent adult's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse by the nonparent adult in the foreseeable future if placed in the parent's home.

In this case, although petitioner established by clear and convincing evidence that statutory grounds existed for termination of respondents' parental rights to AW, and by extension partially satisfied the grounds for termination of respondent-mother's parental rights to KB, the record establishes that petitioner failed to present clear and convincing evidence that there is a reasonable likelihood that KB will suffer from injury or abuse in the foreseeable future if placed in the parent's home. As in *In re LaFrance*, the trial court erred by concluding that grounds existed for termination of respondent-mother's parental rights to KB. This Court observed in *In re LaFrance*, that "[t]ermination of parental rights requires 'both a failure and an inability to provide proper care and custody,' which in turn requires more than 'speculative opinions . . . regarding what *might* happen in the future.' " *In re LaFrance*, 306 Mich App at 732, quoting *In re Hulbert*, 186 Mich App 600, 605; 465 NW2d 36 (1990). Respecting KB, no allegations or evidence suggested or established that respondent-mother had ever abused or neglected KB or that a high likelihood existed that KB would be injured in the future if placed in respondent-mother's home. Concerns over AW did not militate in favor of terminating respondent-mother's parental rights to KB.

In sum, although the trial court did not err by finding that clear and convincing evidence established grounds for terminating respondent-mother's parental rights to AW, the trial court erred by terminating her parental rights to KB.[3] Accordingly, we reverse the trial court's order terminating respondent-mother's parental rights to KB.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Respondent-mother argues that her trial counsel provided ineffective assistance by failing to properly investigate and obtain a more favorable expert witness. We reject this argument for the same reasons discussed earlier in the context of respondent-father's appeal.

Respondent-mother also argues that her counsel provided ineffective assistance by stipulating to the introduction of her psychological evaluation report. We disagree.

Preliminarily, respondent-mother has not presented any affidavit or other offer of proof to support a finding that the psychological examiner's in-person testimony or cross-examination would have been favorable or had a reasonable likelihood of affecting the outcome. In any event, it is apparent from the record that trial counsel made a strategic decision not to call the examiner

---

[3] Respondent-mother also argues that the trial court erred when it found that termination of her parental rights served KB's best interests. Given our conclusion that clear and convincing evidence did not establish a statutory ground for termination of respondent-mother's rights to KB, we need not consider whether termination of her parental rights served KB's best interests.

as a witness. Accordingly, respondent-mother has not overcome the presumption of sound strategy. When discussing respondent-mother's psychological report, Root affirmed that the psychological evaluation report suggested that concerns existed that respondent-mother would not follow through with petitioner's recommendations or requirements. However, Root conceded that such had not occurred and that respondent-mother had done everything asked of her. Counsel established through cross-examination of other witnesses that some of the concerns or predictions identified in respondent-mother's psychological evaluation lacked accuracy or had not materialized. Accordingly, it was not objectively unreasonable for respondent-mother's trial counsel to not call the report's author as a witness.

Respondent-mother also complains that her counsel did not prepare or develop "proofs more favorable," but she presents no offer of proof to support her contention. Thus, she has failed to establish the factual predicate for her claim of ineffective assistance of counsel. *Cooper*, 309 Mich App at 80.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Deborah A. Servitto
/s/ James Robert Redford