*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RONALD EUGENE MARTIN,

        Defendant-Appellant.

UNPUBLISHED
August 10, 2023

No. 359091
St. Clair Circuit Court
LC No. 20-000848-FC

Before: REDFORD, P.J., and K. F. KELLY and RICK, JJ.

PER CURIAM.

Defendant appeals by right the judgment of sentence entered after his jury-trial conviction of four counts of armed robbery and possession of a pneumatic gun during the commission of a felony ("felony-firearm"). Defendant was sentenced as a fourth-offense habitual offender to 30 to 50 years' imprisonment for each armed robbery conviction and two years' imprisonment for the felony-firearm conviction. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

A string of robberies took place in Port Huron, Michigan during late 2019 and early 2020 in which the perpetrator was a male who spoke with an accent, used what appeared to be a black handgun, and followed the same pattern of directing the victims into a back room of the establishment before fleeing. The first two robberies occurred at the same Speedway gasoline station, the third robbery occurred at a Family Video store, the fourth robbery at a Comfort Inn, and the fifth occurred at a SpeedyQ gasoline station. Although no witness was able to identify the perpetrator because he wore a mask, gloves, and baggy clothes, each robbery was recorded by surveillance cameras.

Defendant was identified after investigators noticed the same vehicle—owned by defendant's girlfriend Erica Schemansky—repeatedly driving by the SpeedyQ gas station that was robbed shortly afterwards. The prosecution based its case on circumstantial evidence, including evidence of defendant's DNA at one crime scene, a shoe print consistent with defendant's shoes, location data from defendant's cellphone, and physical similarities between defendant and the perpetrator. Defendant was convicted of four counts of armed robbery, MCL 750.529, and one

-1-

count of felony-firearm, MCL 750.227b(2). The trial court declared a mistrial with respect to the armed robbery count related to the Family Video robbery after the jury deadlocked on that count. Defendant was sentenced as noted earlier, and this appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

On appeal, defendant first argues there was insufficient evidence for the jury to find proof beyond a reasonable doubt that he was the perpetrator of each of the robberies for which he was convicted. We disagree.

### A. STANDARDS OF REVIEW

"Challenges to the sufficiency of the evidence are reviewed de novo." *People v Xun Wang*, 505 Mich 239, 251; 952 NW2d 334 (2020). "In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt." *People v Kenny*, 332 Mich App 394, 402-403; 956 NW2d 562 (2020). "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018).

"[T]he question on appeal is whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Hardiman*, 466 Mich 417, 421; 646 NW2d 158 (2002). "All conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008).

### B. ANALYSIS

On appeal, defendant does not dispute that the same person performed each of the robberies with a pneumatic gun. Rather, defendant only argues that the evidence was insufficient to prove beyond a reasonable doubt that he was that person. "[D]ue process requires the prosecution to prove every element beyond a reasonable doubt." *People v Smith*, 336 Mich App 297, 308; 970 NW2d 450 (2021) (citation omitted). "To evaluate the sufficiency of the evidence, we review the evidence in the context of the elements of the charged crimes." *People v Bosca*, 310 Mich App 1, 17; 871 NW2d 307 (2015). "[I]dentity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

### 1. FIRST SPEEDWAY ROBBERY

The prosecution presented sufficient evidence to prove that defendant was the perpetrator of the first Speedway robbery. Multiple pieces of the perpetrator's clothing were substantially similar or identical with clothing defendant wore in Facebook pictures. Detective Grafton Sharp stated that the perpetrator of the first Speedway robbery was wearing the same red shoes defendant wore in a picture from his Facebook page. Detective Sharp also stated that the red shoes the perpetrator wore were the same shoes that defendant gave to his brother, Donald Martin, which law enforcement later seized. The red shoes had shiny toes and red laces. Additionally, Detective

Sharp testified that the perpetrator wore the same two-tone gray coat with reflective material on it that defendant wore in a Facebook picture. Detective Sharp also found a Facebook picture of defendant wearing a blue bandanna that looked very similar, if not identical with, the blue bandanna the perpetrator wore in the first Speedway robbery. Moreover, the perpetrator had a pack of Newport cigarettes during the robbery, the same brand of cigarettes defendant smoked and that were found on him when he was arrested.

In addition, just before the first Speedway robbery occurred, defendant's Facebook activity ceased. Defendant missed an online chat call that came at 2:04 a.m., and the robbery occurred at 2:50 a.m. Finally, defendant's cellphone location data disappeared from 1:57 a.m. until 2:56 a.m., during which time the first Speedway robbery occurred. Before and after the robbery, defendant's location appeared to be at the Village Manor Townhouses located 1 mile from the Speedway. Though the cellphone location data only represents where defendant's cellphone was, not necessarily where defendant was, viewing the evidence in the light most favorable to the prosecution, it was reasonable for the jury to conclude that defendant was in possession of his phone when its location was documented.

## 2. SECOND SPEEDWAY ROBBERY

The second Speedway robbery shared common characteristics with the first and included multiple elements linking defendant to the robbery. The perpetrator of the second Speedway robbery stole a pack of Newport cigarettes, the same brand of cigarettes that defendant smoked and the same brand the perpetrator was carrying in the first Speedway robbery. The perpetrator was also wearing the same red shoes as the perpetrator was wearing during the first robbery and that defendant was seen wearing in the Facebook picture. When viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have reasonably concluded these similarities demonstrated the perpetrator was the same person in each Speedway robbery.

And like the first robbery, defendant's cellphone location data disappeared from 3:59 a.m. until 4:36 a.m., during which time the second Speedway robbery occurred at 4:14 a.m. Though the missing location data only shows defendant was not using his phone during this time, it was also consistent with the prosecution's theory that defendant was involved in the robbery because the perpetrator did not use his phone during its commission. Since the evidence tended to show that the person who performed the first robbery also performed the second, and the evidence from the first robbery regarding the coat, bandanna, Facebook activity, and missed call indicated defendant was the perpetrator, a rational juror could conclude beyond a reasonable doubt that defendant was the perpetrator of the second Speedway robbery. See *Kenny*, 332 Mich App at 402-403.

## 3. COMFORT INN ROBBERY

In contrast to the Speedway robberies, the perpetrator of the Comfort Inn robbery wore black shoes. The shoeprint left at the Comfort Inn from those shoes matched the design of the tread on defendant's black Nike shoes recovered from his mother's apartment. Though the footprint could have been made from any Nike shoe with the same size and tread pattern, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could reasonably

conclude this footprint was made by defendant, especially considering the other circumstantial evidence linking defendant to this robbery. See *id.*

Additionally, there was strong evidence that defendant was the perpetrator of the Comfort Inn robbery because defendant's DNA was found on the gun slide that was recovered from the crime scene and was from the perpetrator's gun. And since defendant's DNA was on the slide, it was reasonable for the jury to conclude that defendant had direct contact with it because it came from defendant's gun. Defendant's cellphone location data revealed that he was driving in the vicinity of the Comfort Inn on the day it was robbed. And at 11:54 p.m., when the robbery occurred, defendant's cellphone location data showed that he was near the Comfort Inn. Defendant's location remained at the Comfort Inn until 11:57 p.m., when it appeared he moved away from that location. The robbery lasted less than two minutes, indicating defendant's brief presence at the Comfort Inn would have given him sufficient time to commit the robbery.

### 4. SPEEDYQ ROBBERY

At the time of the SpeedyQ robbery, defendant was living with Schemansky. Schemansky's Cadillac was seen driving past the SpeedyQ six times between 3:30 a.m. and 4:30 a.m. before the SpeedyQ was robbed at 4:45 a.m. Sergeant Christopher Bean testified the driver of the Cadillac was likely casing the SpeedyQ in preparation to rob it. Schemansky's testimony identified defendant as the driver of the Cadillac from the Exxon gas station security video footage[1] taken shortly before the SpeedyQ was robbed. Moreover, Schemansky discovered her car had been moved over night and believed defendant had driven it based on how the seat was adjusted. Schemansky also testified that defendant had a habit of taking her vehicle for long periods of time without responding to his phone, and that the keys to her car were always available to defendant while he stayed with her.

On the morning of the SpeedyQ robbery, defendant's cellphone location data showed he was at his mother's Brookstone apartment at 2:03 a.m. At 2:26 a.m., defendant was at Schemansky's house, which is 1.7 miles away from the SpeedyQ. Then, at 3:38 a.m., the location data showed that defendant was in the vicinity of the SpeedyQ, and that defendant was either at or very near the SpeedyQ during the time of the robbery. Though the perpetrator of the SpeedyQ robbery was wearing a different top and shoes than defendant was wearing at the Exxon station at 3:30 a.m. that same morning, the perpetrator was wearing the same distinct pants defendant was wearing in the Exxon. Significantly, the perpetrator wore black athletic shoes, and defendant's black Nike shoes, which matched the footprints of the shoes the robber wore in the Comfort Inn robbery, were found at the Brookstone apartment, where defendant was the morning of the robbery.

The similarities between the robberies supported the prosecution's theory that the same person performed each of the four robberies, and the similarities between the robberies also pointed to defendant being the perpetrator. Each victim described the perpetrator as having an accent.

---

[1] The Exxon, located across the street from the SpeedyQ, had security camera footage that showed defendant inside the Exxon around 3:30 a.m. on the morning the SpeedyQ was robbed at 4:45 a.m.

Kristin Tebo, the employee who was working at the Speedway both times it was robbed, did not specify what type of accent the person had in the first Speedway robbery, but Tebo described the perpetrator's accent in the second Speedway robbery as "Jamaican." The victims in the other robberies also said the perpetrator had a Jamaican accent. This was not only significant to show a similarity between the robberies, it was also significant because defendant was known to speak with fake accents. Notably, Tebo opined that the perpetrator's accent was fake, and Valerie Frank, one of the SpeedyQ employees who was working on the night of the robbery, did not know whether it was real.

In addition, the perpetrator used a black handgun during each robbery, and defendant owned a black pneumatic BB gun that looked like a real gun. In each robbery, the perpetrator was described as a male between 5 feet, 6 inches tall and 6 feet tall, and defendant is approximately 6 feet tall. Finally, in each robbery, the perpetrator used the same method of directing the victims into a back room before leaving. Though no witness was able to identify defendant as the perpetrator, the circumstantial evidence was sufficient for a rational trier of fact to find proof beyond a reasonable doubt that defendant was the perpetrator of each of the four robberies. See *Unger*, 278 Mich App at 222 (holding a defendant can be convicted based only on circumstantial evidence and reasonable inferences arising from it, even without any eyewitness identification).

Viewing the evidence in the light most favorable to the prosecution, the evidence was sufficient for a rational trier of fact to find proof beyond a reasonable doubt that defendant committed each of the four crimes for which he was convicted. In addition to the independent evidence linking defendant to the robberies, each robbery shared a list of common characteristics that linked defendant to them. In each robbery, the perpetrator wore clothing that defendant also either owned or wore in social media pictures. Moreover, during the timeframe of each robbery, defendant's phone location either suspiciously disappeared or indicated he was in the vicinity or at the spot of the robbery when it occurred. Finally, the DNA evidence recovered from the slide strongly suggested the slide belonged to defendant's gun, which in turn demonstrated that defendant was the perpetrator of the robbery. Because a rational juror could conclude, beyond a reasonable doubt, that defendant committed all four of the robberies, we affirm defendant's convictions. See *Hardiman*, 466 Mich at 421.

## III. PROSECUTORIAL MISCONDUCT

Defendant also argues the prosecutor engaged in misconduct by improperly appealing to the jurors' emotions during closing argument when he described the fear that the victims experienced during the commission of the crimes. Again, we disagree.

## A. STANDARDS OF REVIEW

"In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). At trial, defense counsel did not object to the prosecutor's comments about the victims' fear during closing argument or request a curative instruction. The issue is, therefore, unpreserved. "Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights." *People v Clark*, 330 Mich App 392, 432; 948 NW2d 604 (2019). To show plain error, "defendant bears the burden to prove (1) an error occurred, (2)

the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights, i.e., prejudiced defendant by affecting the outcome of the proceedings." *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022) (quotation marks and citation omitted). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010).

## B. ANALYSIS

"Generally, prosecutors are accorded great latitude regarding their arguments and conduct." *People v Cooper*, 309 Mich App 74, 90; 867 NW2d 452 (2015) (citation omitted). "A prosecutor's remarks are examined in context and evaluated in light of defense arguments and their relation to the trial evidence." *Chapo*, 283 Mich App at 370. The prosecutor is "free to argue the evidence and all reasonable inferences arising from it as they relate to the theory of the case." *Id*. However, "[i]t is improper for a prosecutor to seek the jury's sympathy for the victim." *People v Dobek*, 274 Mich App 58, 80; 732 NW2d 546 (2007) (citation omitted).

Defendant was convicted of violating MCL 750.529, which states, in relevant part:

> (1) A person who engages in conduct proscribed under section 530 and who in the course of engaging in that conduct does any of the following is guilty of armed robbery:
>
> (a) Possesses a dangerous weapon.
>
> (b) Possesses an article used or fashioned in a manner that would cause a reasonable person to believe the article is a dangerous weapon.
>
> (c) Represents orally or otherwise that he or she possesses a dangerous weapon.

Section 530, in turn, provides that "[a] person who, in the course of committing a larceny . . . uses force or violence against any person who is present, *or who assaults or puts the person in fear*, is guilty of a felony punishable by imprisonment for not more than 15 years." MCL 750.530(1) (emphasis added). The prosecution's theory of the case was that defendant put the victims in fear during the process of committing larceny while armed. In an effort to convince the jury that the element of fear had been established, the prosecutor discussed the fear the victims appeared to experience.

During the prosecutor's closing argument, the prosecutor stated:

> So let's, let's talk a little bit about the elements of the crime and the element that I want to talk about is fear. Because in this case there were two witnesses, you heard a 911 from one and you heard reading from another who were not here. So we're going to talk about fear because you need to make sure that that element is covered using our reason and common sense.

So this is a screenshot from Kristen Tebo in robbery number two. And you can tell by the way she's crouched and what that gunman is doing that she is afraid. There is no question. We can see that. Reason and common sense.

Kaitlyn Stewart, she was as we were reading, Kaitlyn Stewart worked at Family Video. I want to remind you about what she said. The question was, and what did you do once you were in there? And she stated, I tried to keep breathing and I saw myself in the mirror and I was trying to breathe and calm down. And you've had some ramifications as a result of being robbed, correct? Yes, and had to go to counseling. She was in fear.

The prosecutor's statements were relevant, necessary, and properly based on the evidence presented and reasonable inferences from it. The prosecutor did not improperly seek the jurors' sympathy for the victims in closing argument. Rather, the record shows the prosecutor used trial exhibits to demonstrate that the victims were in fear during the robbery, which was a necessary element of the charged offense. See *Chapo*, 283 Mich App at 370 (holding the prosecutor is "free to argue the evidence and all reasonable inferences arising from it as they relate to the theory of the case."). Moreover, even if the prosecutor's remarks were improper—they were not—defendant cannot show the error was prejudicial because the jury only convicted defendant of two of the three robberies in which the prosecutor addressed the element of fear. Had the prosecutor's arguments overcome the jurors' reasoning by means of emotion, the jury would have also convicted defendant of the Family Video robbery, but it did not. See *Anderson*, 341 Mich App at 279 (under plain error review, defendant must show the error "prejudiced defendant by affecting the outcome of the proceedings").

Affirmed.

/s/ James Robert Redford
/s/ Kirsten Frank Kelly
/s/ Michelle M. Rick